SECURITY WAREHOUSING CO. et al v. HAND et al.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1906.)

No. 1,090.

1. BANKRUPTCY—MODE OF REVIEW—APPEALABLE ORDERS.

A petition filed in a court of bankruptcy in the nature of a bill in equity to establish the right of the petitioner to the possession of certain property also claimed by the trustees of a bankrupt, and to enjoin the trustees from interfering with such possession presents a "controversy arising in the course of bankruptcy proceedings" and does not constitute a proceeding in bankruptcy and the order or decree entered thereon is reviewable by appeal under Bankr. Act 1898, c. 541, § 24a, 30 Stat. 553 [U. S. Comp. St. 1901 p. 3431].

[Ed. Note.—Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.]

2. WAREHOUSEMEN—WAREHOUSE RECEIPTS—LAW GOVERNING.

Whether an instrument constitutes a valid and negotiable warehouse receipt such that its transfer operates as delivery is to be determined by the law of the state.

3. SAME.

Under the law of Wisconsin (with a statutory exception with respect to grain), the owner of property can obtain a negotiable warehouse receipt therefor only when it is stored in a public warehouse openly held out as such, and subject to use by all persons on equal terms.

4. WAREHOUSEMEN—WHO ARE WAREHOUSEMEN—WAREHOUSE RECEIPTS.

A bankrupt was a corporation of Wisconsin engaged in operating knitting mills in that state. A so-called warehouse company incorporated in New York and having its principal office there with a branch in Chicago nominally leased certain spaces in the bankrupt's storage rooms at its mills which were inclosed by open palings having gates locked with a padlock having the name of the warehouse company thereon, and such company issued receipts from its Chicago office to the bankrupt for goods of the latter stored therein which receipts were indorsed by the bankrupts and delivered to claimants as collateral security for loans. All expense of inclosing and maintaining such storage rooms was paid by the bankrupt and certain of its employés were appointed custodians by the warehouse company and had the keys to the inclosures. No goods other than those of the bankrupt were stored therein, and there were no signs on the buildings indicating their occupancy as public warehouses, the only signs of such character being on the inside of the inclosures and on the padlocks. It was also shown that employés of the bankrupt from time to time removed and shipped goods from such inclosures and replaced them with others. Held, that such storage did not constitute a warehousing of the goods within the law of Wisconsin, and that the receipts were not warehouse receipts whose transfer carried constructive possession of the goods as against the bankrupt's trustees or general creditors.

5. SAME—PLEDGE—DELIVERY OF POSSESSION—WAREHOUSE RECEIPTS.

The placing of goods by the bankrupt in such spaces, separated in some cases from the surrounding storage room only by the open slatwork and the taking of receipts therefor from the storage company, did not constitute such a change of possession or delivery to such company as to render the transaction valid as a pledge of the goods to the receipt holders.

6. SAME—EQUITABLE LIENS.

Bankr. Act 1898, c. 541, § 67d, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449], which protects "liens given or accepted in good faith * * * and for a present consideration which have been recorded if record there-

of was necessary to impart notice" applies only to liens perfected according to law of which notice has been imparted by record or otherwise, and does not save an equitable claim, which, under section 67a, "for want of record, or for other reasons," is invalid as a lien against creditors.

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

On a creditors' petition in bankruptcy, filed October 5, 1903, against the Racine Knitting Company, a corporation engaged in manufacturing hose and other knit goods, with factories at Racine and Stevens Point, Wis., the knitting company on October 26, 1903, was adjudged a bankrupt, and appellees were appointed receivers and later were elected trustees.

Appellees asserted a right to certain merchandise covered by receipts issued by appellant security company. Thereupon that company filed in the bankruptcy court its intervening petition asserting its exclusive possession and control of the merchandise, the issuance of its receipts therefor, and the negotiation by the bankrupt, prior to bankruptcy, of the receipts to the other appellants in good faith and in due course of business as security for loans. The petition further alleged that appellees were claiming title to the merchandise and were obstructing the petitioner in its possession thereof. The prayer was for an order that appellees refrain from interfering with the petitioner in its custody and control of the property.

The other appellants intervened, set up the same facts, and prayed that appellees be restrained from interfering with the security company in delivering the merchandise to the petitioners, and from asserting any right or title to the property as against them.

Issues were joined, and the referee reported the evidence and his findings of fact. The findings are as follows:

"(1) That the Racine Knitting Company, the bankrupt, is and was during the periods involved in this reference a Wisconsin corporation, organized for the manufacture of knit goods, hosiery, and underwear, having its principal office at Racine, and factories at Beloit, Stevens Point, and Ripon.

"(2) That the Security Warehousing Company is and was during the same periods a corporation of the state of New York licensed to do business in Wisconsin under section 1770b of the Revised Statutes of 1898, and acts amendatory thereto, and was engaged in the business of 'field warehousing' so-called, owning no warehouses of its own and not occupying any public warehouse at any place; its general method of field warehousing being the leasing of portions of storehouses or buildings or lands occupied in whole or in part by the owners of the goods to be stored. The particular methods pursued in the present case being more fully set forth below. Its corporate purposes, as set forth upon its letter heads, being stated to be the 'warehousing of manufactured stocks and raw materials for purposes of collateral security, or as a medium of purchase and sale and guaranty of possession while remaining on premises of original owner.' The same letter head also contained the words 'Public Warehousemen.' This style of advertising itself was in use in October, 1901, and for some time thereafter, but was abandoned later on except as to the words 'Public Warehousemen,' although at what precise date does not appear. The only reason for the change being stated by the witness Banks, its district manager, that the supply of the older form was exhausted. The warehousing company has never complied with chapter 251, p. 415, Laws 1899 of this state.

"(3) In October, 1901, the Racine Knitting Company executed an agreement of lease to the Security Warehousing Company [Exhibit A] of certain premises at the city of Racine, which are described in such agreement as 'the entire first and second floors of brick building known as Chicago, Milwaukee & St. Paul Railway Company's premises, formerly occupied as a machine shop, situate lots 5 and 8, block 6, Harbor addition to city of Racine; said floors measuring 40 feet from north to south by 60 feet from east to west.' This lease was for the term of one year, and for so long thereafter as any property should remain upon the premises for which receipts of the

143 F.—3

warehousing company were outstanding and in force 'and until duly released of record, for a yearly rental of one dollar and other good and valuable considerations, the receipt of which in advance is hereby acknowledged.' It was further stipulated therein that the leased premises should be used and occupied exclusively for the storage of personal property and for the transaction of business connected therewith on the part of the warehousing company. That the latter should have, for purpose of inspection or removal of property, convenient access through any part of the abutting premises occupied by the lessor. The premises so leased were not in fact wholly occupied by the lessees, but only the second floor and those portions of the first floor marked sections A and C on the plat Exhibit M. The remainder being occupied by the bankrupt and other parties for storage purposes. A further and similar lease as to its terms was executed between the same parties, dated January 24, 1903, [Exhibit C] of a part of the floor space 50 feet by 30 feet in the storage warehouse of the bankrupt situated upon its factory premises at Stevens Point and hereinafter more fully described.

"(4) Cotemporaneously with the execution of these leases the parties thereto entered into agreements in form as shown by Exhibit D setting forth among other things that the knitting company desired the security company to receive and issue storage receipts for certain of its goods and warranting the premises suitable for the purpose, agreeing to keep the same in repair and indemnify the warehousing company against loss, damage, or destruction of the property, and to pay beside the specific storage charges and expenses, the amount of custodian's salary up to $5.00 per month, the charges for storage being based upon the value and not upon the bulk or physical character of the goods to be stored.

"(5) Pursuant to such arrangements the parties thereto caused to be stored in the premises described in these leases certain of bankrupt's goods, both at Racine and at Stevens Point, for which the warehousing company issued and delivered to the bankrupt 12 warrants or storage receipts upon the goods at Racine, and other 12 similar instruments on the goods stored at Stevens Point, in tenor and effect and general form as shown by Exhibit B, of which storage warrants six were delivered to the Hyde & Brittan Bank as security for notes to the amount of $5,300, of which notes or renewals thereof copies are shown in Exhibit E, and delivered the remaining 18 receipts to the petitioner McKeand, five of which were subsequently transferred to the Citizens Bank of Mukwonago as security for a note of $2,000 held by said bank, of which note or renewal thereof a copy is shown at Exhibit F, and the petitioner McKeand holds the remainder as security for notes to the amount of $6,800, copies of which notes or renewals thereof are shown at Exhibit G. Upon the issue of such storage receipts, manifests of the goods therein mentioned were made and certified to by the bankrupt, and by the person named as custodian by the warehousing company; at the foot of each manifest was appended the certificate of the warehousing company, signed by its district manager that storage receipts had been issued upon the property, and giving the numbers used for identification [see Exhibit H]. The storage receipts or warrants recited the receipt of the therein designated goods to be stored, subject to the order of the Racine Knitting Company, which latter company caused them to be severally indorsed in blank by a proper officer, and these warrants are the same warrants held by the several petitioners and claimed by them to confer title and the right of possession to the property therein referred to as security upon the several promissory notes held by the respective claimants and above referred to. It is admitted for the purpose of this reference that the petitioners received the several notes and warrants purporting to secure the same, as stated and claimed by them, and are the holders thereof, or of notes taken in renewal and extension of the original notes upon the same alleged security, except that as to the petitioner McKeand his claim is disputed by the receivers and trustees, who claim that upon the adjustment of unsettled balances between himself and the bankrupt he would be found to owe the bankrupt-estate. As such claims must be determined, in the opinion of the referee, upon objections filed to McKeand's proof of debt, in the ordinary course of procedure and not upon this reference, neither party

is to be concluded or prejudiced by anything on this reference as to the amount of McKeand's claim, or any offsets, counterclaims or objections that the trustees may have interposed or be advised to interpose hereafter.

"(6) That the several petitioners and receipt holders, the Hyde & Brittan Bank, Citizens Bank of Mukwonago, and W. B. McKeand, at all times prior to the institution of the bankruptcy proceedings were unacquainted, either from inspection or inquiry, with the physical nature of the storage of the manifested goods, or the warehousing methods of the Security Warehousing Company, and did not inquire with respect thereto either of the warehousing company or the knitting company, but did make inquiry as to the standing and reputation of the warehousing company and were satisfied therefrom that such standing and reputation were good and relied thereon and upon the contents of the storage receipts themselves. But, that the Citizens Bank of Mukwonago understood that its manifest goods were stored in buildings belonging to or occupied by the bankrupt, and the petitioner McKeand was at all times a director of the bankrupt, and part of the time an officer thereof, and was informed after the acceptance of the storage receipts and notes purporting to be secured thereby that the goods referred to in such storage receipts were stored in the warehouse building of the railway company at Racine, in part used by the knitting company, but had not seen and was not specially acquainted with the storage premises leased to the warehousing company.

"(7) The custodians in local charge of the warehoused goods, both at Racine and Stevens Point, and their respective deputies, were employés of the bankrupt at all times prior to the institution of the bankruptcy proceedings, were selected and nominated by the bankrupt, but received their appointments from the warehousing company, which appointments, and instructions and agreements for their compensation and the designation of their prescribed duties were set forth in written contracts in form and substance in all respects as shown by Exhibit J, and all expense incident to the storing arrangements, such as fees and cost of indemnity bonds of custodians, storage charges and traveling expenses of the warehousing company and its servants for purposes of inspection, delivery, and the like, were charged to and collected from the knitting company.

"(8) The premises so, as aforesaid, leased by the bankrupt to the warehousing company at Stevens Point consisted of a floor space 30 feet by 11 feet, on the inside of the bankrupt's storeroom, separated from the remainder of such storeroom by a substantial slatted enclosure or fence-like paling of boards from floor to ceiling built by the engineer of the knitting company and at its instance, and provided with a sliding door at the north end at the point marked 'X' on Exhibit I, which door was constructed in like manner and locked by a suitable padlock of the 'Jail-lock' type about two inches square, made of bronze and marked 'Premises of Security W'h's'g. Co. of N. Y. Chicago, Ill.' The first two and the last two words of this legend being in raised letters and the balance in stamped or depressed letters on each of the two faces of the padlock; said letters being about one-sixth of an inch in height, the raised letters showing clearly in ordinary light, the stamped letters indistinct but legible in a good light. The lock was affixed by the warehousing company and the key delivered to its appointed custodian by the warehousing company, whose manager had also a pass-key to all the locks of his company. The custodian at Stevens Point was during all the time cashier of the bankrupt, having also principal charge of its stock of goods and materials at Stevens Point and who kept the key upon a ring, with other keys, both personal and those of the bankrupt in or upon the cashier's desk during office hours where the same was accessible and occasionally used by the manager of the knitting company, and at other times the key was kept upon her person. The door was kept locked except when necessary to enter the inclosure. Upon the inside of the inclosure over the door and at the further end of the inclosure were fastened up cardboard signs 'at points X and Z Exhibit I,' which signs were upon substantial manila board, printed in black letters of good size and of which Exhibit K is a specimen. In September, 1903, just before the institution of bankruptcy proceedings, the sign over the

door was removed by the warehousing company, and replaced upon the door itself outside the inclosure. Upon the cases of goods were put small cards of identification like Exhibit L stating the property to be in the possession of the Security Warehousing Company. The boxes and cases were piled six to seven feet high, and there were also boxes and cases piled in the warehouse outside the paling, and this outer space appears to have been crowded much of the time to such an extent as to preclude observation of the large signs without climbing upon the boxes. As to light the testimony is conflicting. There were two windows hung with close shutters, and unless the shutters were open there could have been very little light, and when opened some of the light would be cut off by the piles of goods in store. Access to the inclosure itself was possible only by way of the door, y, leading out of the warehouse building and through the storeroom to the door, x; this door, y, being secured only by the lock of the knitting company to which there were two keys kept on its premises and accessible to its servants, but to which the warehousing company had no key, and could gain access to the building only by using one of the keys of the knitting company. The storehouse was mostly invisible from the street on which the factory premises of the bankrupt fronted and of which premises such storehouse was an integral part, and the property was inclosed by a fence with three gates on the west or side farthest from the storeroom, one of which must be passed to gain access to the storehouse building. There were no signs or marks on the outside of said building or any part of the factory premises indicating any occupation or use by the warehousing company, or that it had thereon any goods in store.

"(9) The premises so as aforesaid leased by the bankrupt to the warehousing company at Racine and used by the warehousing company consisted of the floor space of the second floor, and part of the first floor of a two-story brick building owned by the C., M. & St. P. Railway Company, part of which building was leased by it to the knitting company [see plats Exhibit M and Exhibit N, which are admitted as to the plats only, and not as to any printed recitals thereon tending to support the petitioners' contention]. These premises are no part of the Racine plant or office property of the bankrupt, but are situated several blocks distant therefrom. The floor spaces used by the warehousing company were enclosed by palings or fence-like partitions similar to those constructed at Stevens Point, but not extending more than 10 or 12 feet above the floor, each having a hinged door secured by lock of the same description as that heretofore mentioned, and within these inclosures so constructed the manifest goods were placed. Access to the building is through an outside door forming a general entrance [shown at V on plat Exhibit M] used in common by the occupiers of the building, and not secured; there were numerous windows and sufficient light. In each of the two inclosures sections A and C [Exhibit M] were placed one of the large cardboard signs above referred to, and one on the second floor on a beam near the elevator and smaller signs like Exhibit O were placed on the doors leading to the inclosures A and C, and also one on the stairway door. Signs were also placed on the inside of the elevator inclosure on the second floor, which inclosure was a paling similar to the inclosure A and C on the first floor, and small identification cards [Exhibit L] on each lot of goods stored or on each case. Where the cards were not placed upon each box the lots were separated by a narrow aisle or opening a few inches in width, and this method of storing and marking applied to the goods in all of the above mentioned inclosures. The inclosure about the elevator opened to the second floor by two doors [xx and yy Exhibit N] fastened from the inside. Goods were sometimes left in the inclosures by the bankrupt after being released to prevent pilfering. Other goods not manifested belonging to the bankrupt, principally 'premium goods' so-called such as small tables and cabinets, were stored in the same building, and on three or four occasions manifested goods were taken out of the inclosures by the custodian who was in the bankrupt's employ and who took them out at the bankrupt's direction and other goods were substituted therefor. There were no signs or marks on the outside of the building indicating any occupation or use by the warehousing company or that any manifested goods were stored therein.

"(10) The receivers 'and trustees are in possession of the several buildings containing the manifested goods, but the locks of the warehousing company still remain upon the inclosures, and upon the inclosures at Racine the trustees have added locks of their own, while at Stevens Point the trustees control exclusively all access to the building containing the inclosure within which are the manifested goods at that place, but the lock of the warehousing company is still upon the door leading to such inclosure, which door was temporarily removed by the trustees or receivers by taking off the hinges for the purpose of entering the inclosure.

"(11) Demand was duly made upon the warehouse company by each of the receipt holders of the goods called for by their respective receipts."

The receipts mentioned in the findings were of the form as shown in the following:

"R-N 8117.　　　　　Guaranteed Storage Receipt of　　　　No. 3,244.

Security Warehousing Company.

General Offices: 346 Broadway, New York.

District Offices: 540 The Rookery, 217 LaSalle St., Chicago.

Date December 1, 1902, Issued at Chicago, Illinois.

"The Security Warehousing Company certifies' that it has received on storage in Premises, No. 134, located at Racine, Wis., 1st Floor C. M. & St. P. Ry. Co.'s Whse. subject to the order of Racine Knitting Company, Racine, Wisconsin, the following described Commodity, viz.: Four (4) cases, Nos. 4070, 4073, 4080 and 4090, said to contain not less than Two Hundred Sixty (260) Dozen Pairs Assorted Hosiery and be as per Manifest herewith designated as Exhibit 'A-235'. To be known as Lot No. 286.

"Said Commodity to be retained on Storage and delivered only upon surrender of this receipt properly endorsed and payment of all charges thereon, Provided, however, if such Commodity or any part of it remaining undelivered be not called for within one year from the date hereof, the Security Warehousing Company may, at its option, upon giving three days' notice of its election so to do, store the whole or the undelivered part of such Commodity elsewhere at the expense of whomsoever may then be entitled to the same. The Security Warehousing Company in no event shall be under any liability for errors or mistakes committed in the inspection of such Commodity unless claim in writing therefor be made upon it within one year from the date hereof, and the said Company shall not be liable for the destruction of, or damages to, such Commodity by fire, water or from inherent qualities of the property.

"This Receipt void unless signed by an Agent and Countersigned by W. H. Banks, District Manager.

　　　　　　　　　　　　　　　　　"Security Warehousing Company,
　　　　　　　　　　　　　　　　　　　　"By Alex Greig, President.

"Charges as per Contract.
　"E. C. Curtis, Agent.
"Countersigned:
　"W. H. Banks, District Manager."

Certain exceptions by both sides were overruled by the court, and the petitions were dismissed for want of equity. Appellees have interposed a motion to dismiss the appeal.

Henry S. Robbins, for appellants.

John B. Simmons, for appellees.

Before GROSSCUP and BAKER, Circuit Judges, and HUMPHREY, District Judge.

BAKER, Circuit Judge, after stating the facts as above, delivered the opinion of the court:

1. The motion to dismiss the appeal is based on the contention that

the record presents a "proceeding in bankruptcy" and not a "controversy arising in the course of bankruptcy proceedings." The distinction was recently considered by this court in the case of In re Friend, 134 Fed. 778, 67 C. C. A. 500. The pleadings filed by the appellants in the District Court were in substance bills in equity to establish and enforce their liens and right of possession, and to enjoin the appellees from beclouding their rights and disturbing their possession. The District Court, on the initiative of the appellants, had complete jurisdiction to determine these questions in a plenary suit, which was an independent controversy between adverse claimants and the trustees, and was not a part of the proceedings in the administration of the estate. Dodge v. Norlin, 133 Fed. 363, 66 C. C. A. 425; Liddon v. Smith, 135 Fed. 43, 67 C. C. A. 517; Marshall v. Knox, 16 Wall. 551, 21 L. Ed. 481; Stickney v. Wilt, 23 Wall. 150, 23 L. Ed. 50; Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986. The claim of appellees that the authority of the cases above cited is impaired by the decision in First Nat. Bank v. Title & Trust Co., 198 U. S. 280, 25 Sup. Ct. 693, 49 L. Ed. 1051, is entirely unwarranted. In that case the receiver filed a petition asking the court's directions in respect to a sale of certain property. In the petition the receiver recited that he had taken possession of the property. The adverse claimants appeared specially and objected to the jurisdiction of the District Court to decide the controversy respecting their right of possession. Inasmuch as the adverse claimants were entitled to have their rights determined in a plenary suit, the District Court was without authority to proceed against them summarily, and the District Court could not entertain a plenary suit brought by the trustee, "unless by consent of the proposed defendant." Section 23b Bankr. Act July 1, 1898, c. 541, 30 Stat. 552 [U. S. Comp. St. 1901, p. 3431]. The fact that the adverse claimants were entitled to a plenary hearing in a proper tribunal did not touch the other fact that the receiver's petition to the court for instructions respecting a sale of the property was a proceeding in bankruptcy. As the present record discloses a "controversy arising in the course of bankruptcy proceedings", the appeal was properly taken under section 24a (30 Stat. 553 [U. S. Comp. St. 1901, p. 3431]); and the motion to dismiss is accordingly overruled.

2. Error is predicated on the overruling of appellants' fourth and sixth exceptions to the referee's report. The fourth asserts that the referee erroneously failed to find "that all the doors to the Security Warehousing Company's inclosures at Racine were kept locked, and the keys thereof were always in the custody of the custodian Amend or of the subcustodian Netzinger;" and the sixth "that the two doors at the elevator opening on the second floor [at Racine] were always kept locked, and the keys thereof were continuously in the custody of the custodian [Amend] or subcustodian [Netzinger]." These exceptions assume that the evidence required a finding that the inclosures at Racine were the security company's; that is, that, regardless of the paper forms employed by the knitting company and the security company, the possession and use of the inclosures were in fact un-

equivocally and exclusively in the security company; and that the doors thereto were not opened by Amend or Netzinger except as agents of, and for the purposes of, the security company. The evidence shows that the inclosures in the railroad roundhouse were built by the knitting company; that the lease from the knitting company to the security company included the entire first and second floors, though the inclosures did not; that the knitting company, after the lease, continued to use, for its own storage purposes, the space outside of the inclosures, as it had before; that the goods (hosiery and underwear) were easily movable from place to place; that goods not "manifested" were put in and taken out·of the inclosures by employés of the knitting company; that Amend was assistant general manager of the knitting company, and Netzinger was shipping clerk at Racine; that Amend was absent from Racine a large part of the time, and left the keys with Netzinger; that the security company did not appoint, and Amend had no authority to appoint, Netzinger subcustodian; and that Netzinger as shipping clerk filled orders from cases without or within the inclosures as need required. These, and other facts regarding visible tokens of a change of possession, which will be considered later, satisfy us that the referee's finding was as favorable to appellants as the evidence justified.

3. Were the receipts of the security company entitled to the status of negotiable instruments the transfer of which operates as delivery?

Their validity as proper warehouse receipts is to be determined by the laws of Wisconsin. Hallgarten v. Oldham, 135 Mass. 1, 46 Am. Rep. 433; In re St. Paul & Kansas City Grain Co. (Minn.) 94 N. W. 218.

Chapter 340, p. 346, Laws 1860 (amended by chapter 73, p. 96, Laws 1863), conferred negotiability upon "warehouse receipts, * * * given for goods * * * deposited with any warehouseman, wharfinger, vessel, boat or railroad company, or other person." That the "other person" must be ejusdem generis and must assume an obligation to the public like an innkeeper, or a common carrier, and that the place of business of every one within the class must be openly held forth as such, is shown in Shepardson v. Cary, 29 Wis. 34:

"To uphold the receipt as a proper warehouse document, transferring the title to the property and operating as a good constructive delivery of it to the vendee, it must in all cases distinctly appear. that it was executed by a warehouseman, one openly engaged in that business, and in the usual course of trade."

In Geilfuss v. Corrigan, 95 Wis. 651, 70 N. W. 306, 37 L. R. A. 166, 60 Am. St. Rep. 143, decided in 1897, a furnace company issued formal warehouse receipts upon its own iron, stored in its own yards, to a mining company which used them as collateral. The court said:

"The so-called storage warrants were not warehouse receipts. * * * In order to be such they must be issued by a warehouseman or one openly engaged in the business of storing property for others for a compensation. * * * Not only was there no proof in this case that the furnace company was in the warehousing or storage business, but, on the contrary, the proof was conclusive that it was not in such business, and never had been. The fact that it surreptitiously issued the false receipts in question did not con-

stitute it a warehousing corporation. As well might it be argued that the issuance of counterfeit bills constitutes the counterfeiter a bank."

That was a case of a manufacturer's issuance of documents in the form of warehouse receipts for his own goods, stored on his own premises. Should owners of public warehouses in Wisconsin be permitted to issue negotiable receipts for their own goods, stored in their own warehouses? Should any other persons, not owners of public warehouses, issue negotiable warrants for their own property, in their own possession? These questions were answered by the Legislature in 1899. The act concerning warehouse receipts was amended by adding:

"And any warehouse receipt issued by any person or persons keeping, running and managing a public warehouse, on goods, wares, or merchandise owned by him or them, and which he or they have at the time of issuing such warehouse receipt actually stored in the said warehouse, shall have the same force and effect to protect the owner and holder thereof on any loan or advance of money he may have made on the same, as a warehouse receipt issued by the keeper and manager of a public warehouse to any other person who brings goods, wares, or merchandise to be stored in such public warehouse."

It was also enacted that any person owning grain, or certain other named commodities, who owned or controlled the structure in which his grain was stored, might issue negotiable receipts, provided he first should file in the office of the register of deeds of the county a written statement of his intention and an accurate description of the structure and its location, and should keep an open registration of all receipts issued, and should certify on his receipts that the act had been fully complied with.

These statutes and decisions prove to us that in Wisconsin one who is not an owner of a "public warehouse" or a grainowner that has complied with the last recited statute, can obtain a negotiable warehouse receipt for his own goods in no other way than by taking them to a "public warehouse;" that is, a place that is held out to the public as being one where any member of the public, who is willing to pay the regular charges, may store his goods and then sell or pledge them by transferring the receipt given him by the keeper or manager.

In the present case the main office of the security company was in New York; the nearest district office was in Chicago; from there the receipts were issued; and in Wisconsin the security company had no office and no warehouses, unless the inclosures within the buildings of the knitting company at Racine and Stevens Point be counted such. The receipts themselves would put the holders thereof on notice of these facts. And at Racine and Stevens Point the security company gave no evidences to the public of its presence. No signs were displayed to the passerby. No business was sought from the public. The only property within the inclosures was the knitting company's. The knitting company did not want storage room, but collaterals, which the security company agreed to furnish for a commission upon the amount thereof plus all expenses. The security company's only agents on the scene were the agents of the knitting company who cared for and shipped out its goods. That this was the only busi-

ness contemplated is disclosed by the agreement that the knitting company should be restored to full possession of the premises at any time it returned the outstanding receipts. This, in our judgment, was not warehousing within the law of Wisconsin.

In Union Trust Co. v. Wilson, 198 U. S. 530, 25 Sup. Ct. 766, 49 L. Ed. 1154, it is said:

"Although the first question does not refer in terms to the statutes of Illinois, it is proper to add that we see no sufficient reason for denying to the place of storage the character of a public warehouse. 'Public warehouses of Class C shall embrace all other warehouses or places where property of any kind is stored for a consideration.' Hurd's Rev. St. 1903, § 135, c. 114 (§ 2). These sweeping words embrace any place so used, whether owned or hired by the warehousemen, and, if so, they embrace as well a place hired of the owner of the goods as one hired of anybody else."

We find no provision in Wisconsin that warrants the disregard of the elements of the publicity that attaches to an openly conducted business, and the obligation to serve the public at large.

4. Though the receipts be ineffective as proper warehouse receipts, the security company may have had such a possession that the transactions may be upheld as pledges by the knitting company to the appellant lenders, the security company standing as the agent of the lenders for the purposes of possession.

Wisconsin, in addition to the usual requirements of an actual and continued change of possession of chattels sold or covered by an unrecorded mortgage, has enacted that conditional sales shall be recorded. This unmistakable policy in regard to secret liens on personalty should forbid any laxity in the construction or application of the law of pledges. Seymour v. Colburn, 43 Wis. 67.

Delivery of possession is the very life of a pledge. No mere agreements respecting possession can create it. The contract of pledge cannot exist outside of the fact of change of possession. The pledgor must dispossess himself openly, completely, unequivocally, and "without deceptive combinations which lead third persons into error as to the real possessor of the thing." And the pledgee must take and maintain an open, exclusive and unequivocal possession. Dirigo Tool Co. v. Woodruff, 41 N. J. Eq. 336, 7 Atl. 125; Drury v. Moors, 171 Mass. 252, 50 N. E. 618; Bank v. Jagode, 186 Pa. 556, 40 Atl. 1018, 65 Am. St. Rep. 876; Casey v. Cavaroc, 96 U. S. 467, 24 L. Ed. 779.

At Stevens Point the inclosure was in the knitting company's own warehouse, which was openly occupied and used by it after the lease as well as before. No signs on the building or on the door leading into it announced the presence of the security company. The inclosure in one corner of the building was of slats, between which the packages of goods inside could be seen. No signs regarding the security company's possession were placed on the outside of the inclosure in 1901 nor at any time until in September, 1903, very shortly before the bankruptcy proceedings were begun, when the district manager of the security company came from Chicago, and changed a sign from inside, over the door, to outside, on the door. The signs inside were ambiguous, in that they referred to bins and chutes, and much of the time were not to be seen on account of

the piled-up goods. The security company's agent, on the ground to maintain an open, unequivocal and exclusive possession, was the cashier of the knitting company, who had charge of the stock and of shipping. The key to the inclosure was kept on a ring with other keys used in the business of the knitting company; and this bunch of keys was accessible to the manager of the knitting company, and was left at the office during the cashier's absences. Substantially the same conditions obtained at Racine.

If a creditor desired to look over the property of the knitting company, what would be the probable result? The cashier or shipping clerk or manager could take the bunch of keys, unlock the warehouse, show the raw materials, and broken stock outside of the slatted inclosure, point out the quantity of goods within the inclosure, explain the necessity of the inclosure to prevent pilfering of the hosiery, etc., when the warehouse was open; and nothing would warn the creditor of the deception. And the evidence satisfies us that at least one creditor was so deceived.

So far from the security company's maintaining an open, exclusive, unequivocal possession during the two years this arrangement was carried on, it seems to us that the security company might as well have been eliminated, and the knitting company have employed its own stockkeepers and shipping clerks as custodians for intending lenders, directly, instead of indirectly through the security company. In that view this becomes one of the cases "in which the exclusive power of the so-called bailee" (Union Trust Co. v. Wilson, 198 U. S. 530, 537, 25 Sup. Ct. 766, 768, 49 L. Ed. 1154) tapers away to nothingness. Drury v. Moors, 171 Mass. 252, 50 N. E. 618; Bank v. Jagode, 186 Pa. 556, 40 Atl. 1018, 65 Am. St. Rep. 876.

5. The appellant lenders finally assert that, if they have neither the negotiable receipts of a public warehouseman nor a pledge through an unequivocal possession by their agent, the security company, nevertheless they have "equitable liens" which entitle them to the possession of the property as against the trustees.

The trustee succeeds, as of the date of the adjudication, not only to the bankrupt's title and possessory right to the property, but also to the right of the bankrupt's creditors to assert that the title and possessory right, as to them, is in the bankrupt. Section 70a (4) and (5); section 70e (30 Stat. 565, 566 [U. S. Comp. St. 1901, pp. 3451, 3452]). Liens that remain undisturbed are those that were good against both the bankrupt and his creditors immediately preceeding the adjudication. Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986; Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577; Chesapeake Shoe Co. v. Seldner, 122 Fed. 593, 58 C. C. A. 261. The conclusion results not merely from a consideration of the nature of the trustee's succession, but as well from the inhibitions of the act. Section 67a (30 Stat. 564 [U. S. Comp. St. 1901, p. 3449] vitiates as liens all "claims which for want of record or for other reasons" the bankrupt's creditors might have avoided as liens; that is, no secret liens or equities shall prevail against the trustee that were not good against the general unsecured

creditors represented by the trustee. Section 67d protects "liens given or accepted in good faith * * * and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice." The liens thus saved are liens, not promises to give liens, not equitable claims that what ought to have been done shall be considered done, but liens perfected according to law. "Notice" as well as "a present consideration" is necessary. If a chattel mortgage be given in good faith and for a present consideration, recording is not obligatory, but the imparting of notice is. Recording is one way, another is actual and continued change of possession. If a pledge be similarly given, recording is not "necessary in order to impart notice," because no provision has been made that a record of the fact shall be notice of the fact; but what is "necessary in order to impart notice" is the delivery of exclusive and unequivocal possession. We think that Section 67d does not change Section 67a into the meaning that "claims which for want of record or for other reasons" are not good liens as against creditors are good liens as against the estate if the lender advanced his money without any actual intent to defraud unsecured creditors. He is chargeable with the constructive intent which is attributed to secrecy.

The decree is affirmed.