## JORDAN v. FEDERAL TRUST CO.

(District Court, D. Massachusetts. February 21, 1924.)

No. 1791.

1. **Bankruptcy ⊜184(1)—Warehouse receipts held not to give trust company rights superior to trustee in bankruptcy.**

A trust company financing dealer in automobiles *held* not to have rights superior to those of trustee in bankruptcy of the dealer by reason of its holding of "public warehouse receipts" for cars stored in the basement of the dealer.

2. **Bankruptcy ⊜184(1)—Trust receipt to bank held not to give it any rights as against trustee in bankruptcy.**

Trust receipts, given by dealer in automobiles to bank furnishing money, were not valid as against the dealer's subsequent trustee in bankruptcy, where given with the idea of continuing a lien which the bank supposed it had secured to itself by the use of warehouse receipts given by employee of the dealer as a bonded warehouseman; the cars being stored in the dealer's basement, which was set aside as a warehouse, such warehouse receipts being invalid.

3. **Chattel mortgages ⊜188(1)—Fraudulent conveyances ⊜122(2)—Chattel. mortgage by automobile dealer held fraudulent as to creditor.**

A chattel mortgage by dealer in automobiles, allowing the sale on written authority of the mortgagee of automobiles covered by it was not void in Massachusetts, but was void where the mortgagee knew that the dealer was in financial difficulty, and the mortgage was not given to secure a present advance but to get security for a past loan, and was adapted to give a false credit to the dealer.

4. **Bankruptcy ⊜184(1)—Law of state controls as to validity of chattel mortgage.**

The law of the state must control on the question of the validity of a chattel mortgage, in an action by trustee in bankruptcy to set it aside as in fraud of creditors.

5. **Bankruptcy ⊜140(1)—Estoppel to deny title of bankrupt as against trustee.**

Where the seller of goods on credit has allowed a bankrupt to appear as if he were the real owner, and thus gain credit from the public, the owner is estopped on the bankruptcy of the buyer to set up his title to the goods as against the trustee in bankruptcy.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Bill by Robert A. Jordan, trustee in bankruptcy of Frank E. Wing, against the Federal Trust Company. Decree for plaintiff.

Frederick W. McEnery, of Boston, Mass., for plaintiff.

James E. Cotter and Joseph P. Fagan, both of Boston, Mass., for defendant.

LOWELL, District Judge. This was a bill in equity, brought by the trustee in bankruptcy of Frank E. Wing, to set aside a chattel mortgage as a preference or a transfer in fraud of creditors. Wing was the agent in Boston of the Nordyke-Marmon Company for the sale of the Marmon cars, manufactured by it. He got the money necessary to carry on his business by loans on collateral security from the defendant. The Nordyke-Marmon Company sent cars to Boston with the bill of lading made out to the Federal Trust Company, and drew on Wing for the amount of the shipment. Wing took the draft to the Federal Trust Company, which accepted it and indorsed the bill of lading to him. He then got the cars from the railroad and took them to his place of business at the corner of Ipswich and Boylston streets in Boston. In order to secure itself for the advances to Wing, the Federal Trust Company took a so-called "public warehouse receipt." An attempt was made to establish a public warehouse. Many of the forms of conducting a public warehouse were gone through with. Miss Stearns, Wing's cashier, was appointed a public warehouseman, gave bond, and made publication as required by the statute. She received no salary or compensation of any kind for her duties, as warehouseman. A large part of the basement of the bankrupt's premises was set apart as a warehouse. It was barred off by a partition with a gate in it. The gate was kept locked, but the key hung by the side of the gate and was not kept by Miss Stearns. No signs of any kind indicating the presence of a warehouse were displayed on any part of the premises. No fee was charged for storage, and the cars in the warehouse all belonged to Wing. Miss Stearns kept a receipt book in which she entered the numbers of the cars which were placed in the warehouse. The cars were moved about on the premises at will, and had no mark on them to show that the Federal Trust Company claimed any right in them. When Wing wanted to use one of them for demonstration purposes, he delivered up the warehouse receipt and gave a "trust receipt" in the following form:

### "Trust Receipt.

"April 21, 1922.

"Federal Trust Company, Boston, Mass.—Gentlemen: In consideration of acceptance No. 4524 due 5/8/22 $372913/100 made for my account I hereby agree to hold the following goods in trust for you and as your property, to wit: Marmon Car # 15220126 for demonstrating purposes, with liberty to sell the same for your account, and further agree, in case of sale, to hand the proceeds to you to apply against your acceptances on my account, and for the payment of any other indebtedness of mine to you.

"You may at any time cancel this trust and take possession of said goods or of the proceeds of such of the same as may then have been sold wherever the said goods or proceeds may then be found and in the event of any suspension, or failure, or assignment for the benefit of creditors, on my part, or of the nonfulfillment of any obligations and of the nonpayment at maturity

of any acceptances made by you for my account hereunder, all obligations and acceptances whatsoever shall thereupon (with or without notice) mature and become due and payable. These goods while in my hands shall be fully insured against loss by fire and insurance eertificates in your favor placed in your possession.

"Frank E. Wing,
"By M. Stearns, Atty."

It was shown by the evidence that Wing sold the cars by sample, showing customers some cars in the salesroom and promising to deliver one like the sample. When a car was sold, delivery would not ordinarily be made without the sanction of the Federal Trust Company, which authorized Wing to take the car from the warehouse.

On May 25, 1922, the cars on which the Federal Trust Company had made loans were all covered by either warehouse receipts or trust receipts. On that day all these receipts were given up, and a chattel mortgage was taken in their stead. The mortgage was duly recorded. It contained, among other covenants, one stating that the mortgagor "shall not, except with the consent in writing of the grantee or its representatives, attempt to sell or to remove from Suffolk or Middlesex counties the same or any part thereof." After this several of the cars were sold by Wing.

Wing had been a borrower at the bank for several years, always furnishing collateral security. His business had grown from a small beginning until it had assumed large proportions. On February 15, 1922, Wing for the first time was given a loan, of $25,000, without security. Mr. O'Neill, the president of the Federal Trust Company, testified that he thought Wing would pull through all right—that the loan was given at a time when many persons needed assistance on account of the disturbance in business brought about by the war. Wing was in difficulties, and in the early part of June an arrangement was proposed for getting him out of his troubles, but it was not carried out. On August 10 the Federal Trust Company took possession of the cars covered by the mortgage, and on August 12 a petition in bankruptcy was filed against Wing, and the plaintiff was afterwards elected trustee.

The evidence showed that the chattel mortgage was taken because the Federal Reserve Bank would no longer lend money on warehouse receipts. The evidence satisfies me that in May the Federal Trust Company knew that Wing was in difficulties, but that, although early in June it was fully aware of the situation, on May 25, the date of the mortgage, it did not have sufficient knowledge to be aware that the chattel mortgage gave it superior advantages over other creditors.

There are three fundamental questions in this case: First. Was the chattel mortgage an exchange of one good security for another, and therefore valid under the well-known rule? Second. If not, did it constitute a preference? And third. If it was not a preference, was it invalid because under it sales were made just as before, without other notice to creditors than the recording of the mortgage?

[1] The first question may be shortly answered. The warehouse receipts did not give the Federal Trust Company any rights superior to those of the trustee in bankruptcy. Security Warehousing Co. v. Hand, 143 Fed. 32, 74 C. C. A. 186; Id., 206 U. S. 415, 27 Sup. Ct. 720, 51

L. Ed. 1117, 11 Ann. Cas. 789. See McPherson v. Mass. Trust Co. (D. C.) 291 Fed. 676, where other authorities are referred to.

[2] The trust receipts raise an interesting question. This was an ingenious attempt to get valid security by the use of a trust receipt for a purpose wholly foreign to its legitimate use. There has been some confusion in the authorities, but the true doctrine has been recently laid down in a very able opinion by Judge A. N. Hand in the Court of Appeals for the Second Circuit in Re Fountain, 282 Fed. 816, 25 A. L. R. 319. See, also, an article by Karl T. Frederick, Esq., of the New York bar on "The Trust Receipt as Security," 22 Columbia Law Rev. 395 et seq. The true function of a trust receipt is to enable a banker to finance a loan for the importation of merchandise by a merchant, or the domestic purchase of such merchandise. Credit is given by the banker to the foreign or domestic seller of the merchandise, by means usually of a letter of credit. The bill of lading for the goods is sent to the banker, who then delivers it to the buyer under a trust receipt, for the purpose of getting the merchandise entered at the customs house or placed in a warehouse, or sometimes for the purpose of its sale in bulk, or even of its being manufactured into salable articles. In every case the banker retains title as security for his loan, and the buyer is given possession of the bill of lading merely to accomplish a specific purpose. When this purpose is accomplished, the trust receipt is given back to the bank. The most recent case in Massachusetts is a typical instance of the true use of a trust receipt. Brown v. Green & Hickey Leather Co., 244 Mass. 178, 138 N. E. 714.

In the case at bar, the trust receipts were given with the idea of continuing a lien which the defendant supposed it had secured to itself by the use of the warehouse receipts. The trust receipt had no more validity than if it had read:

The Federal Trust Company has loaned F. E. Wing $1,000 on Marmon car No. 1000000, which he promises to repay on the sale of said car.

Neither the warehouse receipts nor the trust receipts were valid, so that their surrender in exchange for the chattel mortgage did not give that instrument any validity.

The chattel mortgage was given within four months of bankruptcy, and thus the second question arises—as to whether it was a preference. On the evidence before me, this is an extremely close question, but with great hesitation I have come to the conclusion that on May 25, the date of the mortgage, the Federal Trust Company did not have information requiring it to make an investigation which would have disclosed the insolvency of Wing.

[3, 4] The third and final question remains—whether the chattel mortgage was void. It contains, as we have seen, a clause allowing the sale, on the written authority of the mortgagee, of the cars covered by it. There is very considerable authority to the effect that a chattel mortgage covering articles which may be sold in the course of the business of the mortgagor is absolutely void. Robinson v. Elliott, 22 Wall. 513, 22 L. Ed. 758; Williston, Transfer of After-Acquired Personal Property, 19 Harv. Law Rev. 557, 569; and see In re Aronson (D. C.) 245 Fed. 207. This is not, however, the law of Massachusetts (Blanchard

v. Cooke, 144 Mass. 207, 11 N. E. 83) which is controlling in this connection (Matter of Floyd-Scott Co. [D. C.] 224 Fed. 987), as was somewhat strenuously stated by Judge John Lowell in the case of Brett v. Carter, Fed. Cas. No. 1844, 2 Low. 458. It is, however, a circumstance to be taken into account in considering whether the mortgage is void. Briggs v. Parkman, 2 Metc. (Mass.) 258, 37 Am. Dec. 89; Blanchard v. Cooke, 144 Mass. 207, 11 N. E. 83; and see Burbank v. Crooker, 7 Gray (Mass.) 158, 159, 66 Am. Dec. 470; Spooner v. Cummings, 151 Mass. 313, 23 N. E. 839; Guaranty Security Co. v. Eastern Steamship Co., 241 Mass. 120, 134 N. E. 364. See, also, Kellogg v. Tompson, 142 Mass. 76, 6 N. E. 860; Keith v. Maguire, 170 Mass. 210, 48 N. E. 1090; Martin v. Mathiot, 14 Serg. & R. (Pa.) 214, 16 Am. Dec. 491; In re Hartman (D. C.) 185 Fed. 196. The history of the chattel mortgage statute in Massachusetts shows that it was passed to prevent fraud. The title of the first act on the subject (Acts 1832, c. 157) was "An act to prevent fraud in the transfer of personal property."

In the present case the Federal Trust Company knew that Wing was in difficulties. The mortgage was not given to secure a present advance, but to get security for a past loan, and was adapted to give a false credit to Wing. Under these circumstances I hold that the mortgage was fraudulent as to creditors.

[5] The law relating to transfers by a bankrupt has undergone a great change in this country since the Amendment of 1910 (36 Stat. 838). Under the Bankruptcy Act of 1867 (14 Stat. 517), a trustee in bankruptcy ("assignee," as he was then called) occupied merely the position of the bankrupt. The same doctrine was laid down under the present act (Comp. St. §§ 9585–9656) by the Supreme Court of the United States in the case of York Mfg. Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782, although there were many varying decisions in the lower courts. The amendment of 1910, however, has given the trustee in bankruptcy much greater powers over transfers by the bankrupt whom he represents. The earlier cases, therefore, are not now in point. 2 Collier, Bankruptcy (13th Ed.) p. 1511; Black, Bankruptcy (3d Ed.) § 316.

The English law covering a situation like the present one is somewhat peculiar. There is a doctrine in England, which was given statutory recognition in the reign of James I., that goods in the order and disposition of a bankrupt are to be considered as belonging to the bankrupt, whether they really belong to him or not. Williams, Bankruptcy Practice (11th Ed.) pp. 209, 256. This is usually referred to in the cases in America as the doctrine of reputed ownership or ostensible ownership, and it has often been said that the doctrine does not obtain in this country. Frelinghuysen v. Nugent (C. C.) 36 Fed. 229, 237; Greey v. Dockendorff, 231 U. S. 513, 34 Sup. Ct. 166, 58 L. Ed. 339.

A very similar doctrine, however, which has grown up in this country is based on the ground of estoppel. One of the ablest of American equity judges has thus stated the proposition:

"It has for ages been a rule of the English bankruptcy law that possession with reputed ownership renders property liable for the debts of the possessor to those who have given him credit on the faith of it. This principle of that law is just. We have no such law in terms, but, wherever the case oc-

curs, equity will favor the application of the principle. It adopts it fully in favor of bona fide purchasers against those claiming the benefit of a secret trust." Bradley, J., in Frelinghuysen v. Nugent (C. C.) 36 Fed. 229, 237.

This was in 1888. Since then there have been many decisions which hold that where the seller of goods on credit has allowed a bankrupt to appear as if he were the real owner, and thus gain credit from the public, the owner is estopped, on the bankruptcy of the buyer, to set up his title to the goods. The doctrine is treated with full discussion of authorities in a very able text-book. Glenn, The Rights and Remedies of Creditors, cc. 9 to 13, inclusive. See, also, In re Hub Carpet Co. (C. C. A.) 282 Fed. 12, 15. It is not necessary in the present case to frame a comprehensive rule on the subject of reputed ownership. It is sufficient to hold that under the circumstances of this case the chattel mortgage is not valid as against the trustee in bankruptcy.

The chattel mortgage may be set aside, and the plaintiff may recover the sum of $76,569.31, the money received for the cars covered by the mortgage.