## MEEHAN v. BEACON TRUST CO. et al.
### No. 3363.

District Court, D. Massachusetts.
March 11, 1932.

R. A. B. Cook, Phipps, Durgin & Cook, and Frank S. Deland, all of Boston, Mass., for plaintiff.

Alfred R. Shrigley and Edward R. Hale, both of Boston, Mass., for defendants.

LOWELL, District Judge.

This is a bill in equity brought by the trustee in bankruptcy of Adams, Blake & Bonney to recover alleged preferences. The defendants are Beacon Trust Company and Atlantic National Bank. The latter is added because it took over the business of the Beacon Trust Company after the occurrences which give rise to this suit. The Beacon Trust Company will be hereafter referred to in this opinion as "the defendant."

Oscar A. Adams had been engaged in selling foodstuffs on commission for many years. He had been a depositor during that time with the defendant or its predecessor the Faneuil Hall National Bank, and had conducted his financial affairs with Frank B. Lawler, who was a vice president of the defendant. In 1927 Adams became the treasur-

er of the bankrupt, which was incorporated in that year.

The bankrupt's business consisted largely in selling beans, which came from New York, Illinois, and further west. A shipment of beans would be sent to Boston with a negotiable bill of lading made out to the bankrupt. Adams would take the bill of lading to the defendant, which would issue a banker's acceptance, coming due at a future date, for the invoice price of the beans, and would give the bill of lading back to Adams, taking in its place a trust receipt signed by Adams for the bankrupt. At the same time checks for the amount of the acceptance would be given to the defendant by Adams, which would be used to pay the banker's acceptance at its maturity. In its dealings with the defendant the bankrupt was given a credit on unsecured loans to the amount of $15,000.

The bankrupt's business was a seasonal one, requiring money during the spring and early summer. Its unsecured loans had always been paid up by August or September. A statement of its condition was given each year to the defendant. These statements showed that for the years 1927, 1928, and 1929 the bankrupt was holding its own, but not making any headway. During the year 1928 it borrowed on unsecured loans largely in excess of its line of credit, and the defendant required it to keep a special deposit of $3,000, which was not to be drawn on but was used as security for the $15,000 line of credit, it being the custom of the bank to require a daily balance of deposits equaling 20 per cent. of the line of credit granted to a depositor. This deposit was set up in exchange for a demand note of $3,000 on which the bankrupt paid interest.

In the summer of 1929 the bankrupt did not pay up its loans as it usually had done. Lawler had many talks about this with Adams, who said that he hoped and expected to be able to pay up by the end of the year. After November 17th the defendant gave no more credit to the bankrupt, and Lawler "bore down," as he expressed it, on Adams to make him pay up. In the latter part of November there were three overdrafts of more than $2,000 each. This had never occurred before. On December 2d the bankrupt made a deposit by discounting a note of a creditor for $380, which it had never done before. There was no evidence as to whether this was done before or after the banker's acceptance for $8,000 was renewed.

On December 2d a banker's acceptance for $8,000 came due. Adams told Lawler that the bankrupt could not meet it, and asked what he should do. Lawler then required the bankrupt to assign to it accounts receivable of the face value of $10,000 as security for the plaintiff's demand note for $8,000, which was used to take up the banker's acceptance. This was the first time, except in the case of the special deposit, when a demand note had been required. The bankrupt assigned the accounts receivable to the defendant under an arrangement whereby the bankrupt should collect them and pay the defendant. There was no entry on the books of the bankrupt to show this assignment. When the defendant took the assignment it gave back the trust receipt which had been given in the usual course of the business.

The bankrupt paid to the defendant $2,900 which it collected from the accounts, and after bankruptcy the defendant collected $3,378.70 more. On December 13th the defendant closed the special deposit of $3,000 by canceling both it and the demand note for that amount and charging the amount to the defendant.

After November 1st an unsecured loan of $2,500 was made on November 17th, which was paid on December 17th, and the following loans were made for which the defendant took trust receipts:

| | |
|---|---:|
| November 4 | $ 6,000 |
| November 15 | 5,000 |
| November 27 | 2,500 |
| November 29 | 5,000 |
| December 6 | 2,500 |
| | $21,000 |

These were paid between December 1st and December 16th. In several instances the checks given to pay them were used before the maturity of the acceptance, which had never been done before. No discount was credited to the bankrupt for this prepayment.

On December 18th a meeting of creditors of the bankrupt was called, and the voluntary petition in bankruptcy was filed on December 28th.

There is no doubt that the bankrupt was insolvent on December 2d, and in my opinion the defendant had reasonable cause to believe that any payments made to it after that date would effect a preference. The transactions between the bankrupt and the defendant after December 2d fall into four classes: (1) The payment of the unsecured loan; (2) the closing out of the special deposit; (3) the payment of the banker's acceptances; and (4) the assignment of accounts receivable.

The first is undoubtedly void as against the trustee in bankruptcy, as it was a payment on an unsecured debt. As to the second, the special deposit was closed by canceling it and the note at the same time and charging the amount of $3,000 against the bankrupt's account. This is also a preference.

·The result as to the last two classes depends on the validity of the trust receipts. In the case of the banker's acceptances, trust receipts were given at the time the acceptances were issued. In the other case the assignment of accounts was taken in exchange for a trust receipt.

When trust receipts are used as security for money loaned they are not valid as against a trustee in bankruptcy. It is an attempt, not often successful, to have one's cake and eat it too. The beans for which the banker's acceptances were issued had never been the property of the defendant; the bill of lading being drawn to the order of the bankrupt. The trust receipt was merely an agreement by the bankrupt to hold its own property in trust for the defendant. Whatever its effect as between the parties to the instrument, it is void as to creditors. Hartford Accident & Indemnity Co. v. Callahan, 271 Mass. 556, 171 N. E. 820; In re Fountain (C. C. A.) 282 F. 816, 25 A. L. R. 319; Jordan v. Federal Trust Co. (D. C.) 296 F. 738. · ·

The payment of the banker's acceptances was the payment of unsecured debts, and the assignment of accounts was the procuring of a good security in place of a bad one, not, as the defendant contends, an exchange of securities both of which were good. They both are preferences.

The amounts which the trustee in bankruptcy is entitled to recover from the defendant are as follows:

| Amount | Description |
|---|---|
| $ 21,000. | moneys paid on trade acceptances |
| 3,000. | special account charged against bankrupt |
| 2,500. | amount paid on unsecured note |
| 2,900. | amount paid on assigned accounts before bankruptcy |
| 3,378.70 | amounts paid on assigned accounts after bankruptcy |

Total $32,778.70

A decree may be entered in favor of the plaintiff for that amount, together with interest from June 18, 1930, the date when the plaintiff made his demand upon the defendant. Let there be an order entered also requiring the defendant to deliver to the plaintiff any of the assigned accounts which have not yet been collected.