**BACHE et al. v. HINDE et al.**

(Circuit Court of Appeals, Sixth Circuit. July 15, 1925.)

No. 4206.

**1. Warehousemen ☜15(1)—Certificates held not "negotiable warehouse receipts."**

Certificates of warehouseman, purporting to entitle named person or his assigns to certain number of cases of whisky, but which did not acknowledge receipt of, nor refer to, specific goods, identified by mark or otherwise, *held* not "negotiable warehouse receipts," within Ky. St. §§ 4768–4770.

**2. Warehousemen ☜12 — Negotiability of warehouse receipts determined by law of state.**

In action in federal court, negotiability of warehouse receipts, in sense of cutting off defenses through bona fide purchase, is determined by law of state.

**3. Warehousemen ☜16 — Burden of proving equitable right against owner is on claimants.**

Purchasers of nonnegotiable warehouse certificates, purporting to be for whisky and issued by one of joint owners of whisky in warehouse, *held* to have burden of proving equities to whisky superior to other joint owners.

**4. Warehousemen ☜16—Purchasers of nonnegotiable warehouse certificates for whisky, issued by one of joint owners, held not to have prior equities to other owners.**

The purchasers of nonnegotiable warehouse certificates for case whisky, issued by one joint owners without knowledge or consent of others, *held* not to have secured equities prior to other joint owners, notwithstanding surrender of warehouse receipts for barreled goods, making possible issue of duplicate receipts, forbidden by Ky. St. §§ 4773, 4775.

**5. Parties ☜40(3)—Dismissal of petition in intervention, without prejudice to independent right of action, not error.**

Where one of joint owners of whisky undertook to sell same, and delivered warehouse certificates without consent and knowledge of others, who brought suit to prevent consummation of sale, dismissal without prejudice of petition in intervention by purchasers, asking in alternative a personal judgment against defendant, who issued certificates, *held* not error, there being no absolute right of intervention.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Proceeding by Thomas W. Hinde and another against John B. Thompson to prevent consummation of sale of whisky, and for an accounting, in which Jules S. Bache and others, partners comprising the firm of J. S. Bache & Co., intervene. From a decree denying interveners recovery, the latter appeal. Affirmed.

Helm Bruce, of Louisville, Ky., and Edward S. Seidman, of New York City (Robert G. Gordon, of Louisville, Ky., Henry Wollman, of New York City, and Bruce, Bullitt, Gordon & Laurent, of Louisville, Ky., on the brief), for appellants.

Colin C. H. Fyffe, of Chicago, Ill. (David R. Clarke, of Chicago, Ill., D. L. Hazelrigg, of Frankfort, Ky., Mason, Spalding & McAtee, of Washington, D. C., and Leslie W.

Morris, of Frankfort, Ky., on the brief), for appellees Hinde and Rosenbloom.

Robert S. Alcorn and Thos. D. Slattery, both of Cincinnati, Ohio (Maurice L. Galvin and A. D. & R. S. Alcorn, all of Cincinnati, Ohio, on the brief), for appellee Thompson.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. Appeal from decree denying recovery upon certain certificates. Appellee Thompson was the owner of a distillery at Harrodsburg, Ky. In May, 1920, shortly after the Prohibition Act took effect, there were in this warehouse about 7,500 barrels of Old Jordan whisky of the 1913 and 1914 crops, and more than 19,000 cases of the same whisky, which had been bottled at this distillery from barrels. The three appellees were the equitable owners of all this whisky—both barreled and cased—under joint agreement, whereby Hinde (who lived in Chicago) and Rosenbloom (who lived at Pittsburgh, Pa.) had for a long time been making advances for interest and insurance to carry the goods until they should be sold, the profits from such joint account to be shared equally. On May 9, 1920, Thompson contracted with the so-called "Woltenham Corporation" to sell to it, at a given price, warehouse receipts for 19,601 cases of whisky of the kind and crops mentioned, described as having been bottled in bond in 1919, and being then stored in the warehouse in question; also warehouse receipts for 7,500 barrels of the same brand of whisky as being similarly stored. As part of the transaction the "Woltenham" was to buy Thompson's distillery, bottling plant, storage warehouse, etc., and to make payment for everything in a manner or by a time therein specified. Three days later (May 12, 1920) Thompson made a brokerage agreement with the so-called "Hargate Corporation" to furnish the latter warehouse receipts for 10,750 barrels of Old Jordan whisky, with liberty to supply the deficit in such receipts for Old Jordan by delivering receipts for other whisky as near like Old Jordan in age and quality as practicable—Thompson to bottle the whisky in bond at a named price. The "Hargate Corporation" agreed to use the bulk of the proceeds of the warehouse receipts in buying for Thompson certain corporate stocks. On the same day one McAllister contracted to buy from the Hargate Corporation 10,750 barrels of the description of whisky in question to be delivered by turn-ing over warehouse *certificates*[1] in designated lots, to be paid for at certain rates, with bottling privileges. Little is known about either the "Woltenham" or "Hargate" corporations. Whether there were in fact such organized corporations is not shown. The most that is known is that McAllister and one Lee, between them, somehow represented the two concerns or did business in their names.

On July 9, 1920, Thompson acknowledged receipt from the Woltenham, through the Hargate, of drafts "on London," drawn on and accepted by McAllister, for $768,000, and check on New York for $1,587, "in settlement for warehouse *certificates* for 19,600 cases and warehouse receipts for 7,500 barrels of Old Jordan whisky as per contract of May 9, 1920," Thompson agreeing to hold the warehouse receipts for the barrels and to bottle same as directed by the Hargate, subject to a certain minimum and maximum, and on the same date Thompson delivered, and "Hargate," by Lee, receipted to him for, 84 warehouse *certificates*, each for 1,200 cases of Old Jordan whisky (thus aggregating 100,800 cases), identified as delivered "under contract of May 12, 1920, between Hargate Corporation and J. B. Thompson," with permission to Hargate to sell and deliver warehouse certificates not exceeding 14,400 cases, the remaining certificates (there would be 72 remaining out of the 84) to be placed in trust with a New York trustee of ample responsibility, under agreement for delivery beginning August 1, 1920, and not less than 6,000 cases per month, "Hargate" to advance to Thompson at once an amount of cash against the amount coming to him under the Hargate contract proportionate to the amount it received on account of the "warehouse certificates."

On the 10th day of July, 1920 (the same day on which Thompson delivered the certificates to "Hargate"), Murphy, who was a member of the appellant copartnership, purchased (ostensibly in his own name) from *McAllister* the warehouse certificates here in question for 14,400 cases at a price of $17.50 per case, to be paid forthwith, Murphy also agreeing to use his best endeavor to effect lawful resale of the same "or of said whisky" at the highest possible price, etc. McAllister also gave Murphy the exclusive option to buy the unsold certificates for 86,400 cases, in lots of 1,200 cases, in minimum and maximum amounts named, at the prices

---

[1] All italics in this opinion ours, unless otherwise stated.

at which the certificates for 14,400 cases were sold (plus a storage charge), McAllister to deposit such certificates with appellants. The resale prices, both on the 14,400 cases sold to Murphy and the 86,400 cases under option, were to be fixed by Wexler, another member of appellant's firm appointed for the purpose as the agent and representative of all parties to it—one-fifth of the profits as to both groups of certificates to be paid to McAllister.

On the same day *appellants* acknowledged receipt from McAllister, in trust, of the entire 84 warehouse certificates for 1,200 cases each of *quarts*, and on the same day gave their check to McAllister for $252,000, which was the agreed purchase price of the 14,400 cases. McAllister seems to have cashed Bache & Company's check, and on the same day to have given a bank a check for $177,-000 "for deposit to credit of Hargate Corporation." What became of the funds later nowhere appears, except as McAllister gave checks on the same bank October 26, 1920, for $10,000, and on November 24, 1920, for $18,580, both for deposit to credit of Hargate Corporation. Neither Thompson nor either of his coappellees received anything from appellant's payments. The drafts "on London" were never paid. It is plain from this record that the certificates were obtained from Thompson by an outright swindle.

In a proceeding in the court below on behalf of the appellees Hinde and Rosenbloom,[2] to prevent the consummation of the sale of the whisky and for an accounting, Murphy intervened and asked that he be adjudged the owner of the 14,400 cases of whisky, and by amendment, that in failure thereof recovery be permitted against Thompson, with lien against his interest in the whisky. Later appellants appeared as claimants, Murphy's pleadings being adopted as theirs. The district judge was of opinion that the contract of sale relied upon to support appellants' title did not embrace the whisky here in question, and accordingly denied appellants relief.

[1] In the view we take of the case it is unnecessary to consider whether the trial court properly construed the scope of the contracts under which McAllister obtained the certificates. The transaction having originated in fraud, it is of prime importance to determine whether appellants are good-faith

purchasers of the certificates in such a sense as to entitle them to recover the whisky from the victims of the fraud of appellants' immediate vendors.

The Kentucky warehouse statute, then and now in force, provides (Ky. St. § 4768) that "any person or corporation who shall receive * * * whisky * * * or any other kind or description of personal property or thing whatever in store, or undertake to receive or take care of the same, with or without compensation or reward therefor, shall be deemed and held to be warehousemen." Section 4769 provides that "every warehouseman receiving anything enumerated in the preceding section shall, on demand of the owner thereof or the person from whom he receives the same, give a *receipt* therefor, setting forth quality, quantity, kind, and description thereof, if known, and which shall be designated by some mark, and which receipt shall be evidence in any action against said warehouseman." By section 4770 it is declared that "all receipts issued by any warehouseman as *provided by this chapter* shall be negotiable and transferable by indorsement in blank, or by special indorsement, and with like liability as bills of exchange now are, and with like remedy thereon." If the warehouse statute is complied with bona fide holders of receipts are protected against the frauds of their predecessors. Greenbaum v. Megibben, 10 Bush. (Ky.) 419, 423; Cochran v. Ripy, 13 Bush. (Ky.) 495, 505.[3]

The 12 certificates here in question were a portion of the block of 84 certificates of date May 12, 1920, numbered serially and successively, taken by appellants, long after the purchase in question, at random from the then top of the pile and unsegregated and unidentified, each headed "Warehouse Certificate," the body reading as follows:

"It is hereby certified that John B. Thompson, or assigns, on surrender hereof, will be entitled to receive at the Old Jordan Distillery, Harrodsburg, Kentucky, 1,200 cases of 12 quart bottles, 100% proof, Old Jordan whisky (1913 and 1914), upon payment of

[2] The proceeding was instituted by Hinde, against Thompson and Rosenbloom, July 17, 1920, seven days after Thompson had advised him of the general fact of the sale. Rosenbloom aligned himself as coplaintiff.

[3] Although warehouse receipts are negotiable, the holder of them takes no better title than if the goods were held by him. Such receipts represent the property to which they refer, and their negotiability serves only to cut off any defense the warehouseman may have. First Nat. Bank v. Boyce, 78 Ky. 42, 39 Am. Rep. 198. The fact that Thompson was both warehouseman and one of the owners of the whisky did not of itself make the storage receipts invalid. Cochran v. Ripy, supra; Taney v. Penn Bank, 232 U. S. 174, 34 S. Ct. 288, 58 L. Ed. 588.

all taxes and governmental charges, and on production of all permits and bonds necessary or required for the removal, transportation, and sale of said whisky under the National or State Prohibition Acts.

"J. B. Thompson, Distiller."

Assignments in blank upon the backs of the certificates were signed by Thompson. The conclusion otherwise reached as to the status of these certificates makes it unnecessary to consider whether appellants could, in the manner stated, acquire title to the entire of the quart case goods, forming in fact the basis of the 84 certificates.

In our opinion these "certificates" were not warehouse receipts within the purview of the Kentucky statute, and so were not negotiable as the statute provides in case of receipts. The statute provides for the giving of a "receipt" for specific articles received in store and for care, and such receipt is required to set forth "the quality, kind, and description thereof," if known, and "to be designated by some mark." The certificates in question did not acknowledge the receipt of, nor did they refer to, any specific goods identified by mark or otherwise. Under the language of the certificates it would have been entirely competent for Thompson to supply goods answering to the general description from wholly outside sources. The so-called certificates were in terms wholly consistent with an intention on Thompson's part to do precisely what he did, viz. issue certificates for more than 100,000 cases of *quarts,* although he had on hand but a trifle more than 14,000 cases thereof (less than the amount covered by the 12 certificates here in question), and less than 20,000 cases of bottled whisky all told. The idea of receipt for specific goods in store or for care is wholly lacking. Williston on Sales, § 416.

Thompson testifies, without dispute, with reference to the issue of these certificates: "I had refused to issue them [Lee] warehouse receipts, and I gave them these certificates, which show upon their face that they were not negotiable instruments, and not so intended." We think they clearly so show. Murphy says that "our understanding [apparently from McAllister] was that these warehouse certificates covered whisky that had been taken out of bond, and the warehouse receipts or government certificates had been surrendered, and this was all ready for casing." The fundamental departure of the certificates from the statutory standard appears by comparison with the standard form of warehouse receipt, whose body is copied in part in the margin hereof.[4]

We are not impressed that, in a situation such as presented here, the lack of distinguishing marks became unimportant. The case is not one where a document can be aided by proof of intention, nor is the defect merely literal or formal. On the contrary, the certificates are in terms opposed to the whole spirit of the Kentucky warehouse statute, whose only recognized document is a "receipt," as has already appeared. To require that an instrument intended to pass as a receipt under the statute should in suitable language declare or acknowledge such receipt is not to sacrifice substance to form. The negotiability of a warehouse document, as well as of a note or bill of·exchange, is tested by the terms of the instrument. The Kentucky authorities, so far as cited by appellants or so far as we have found, fail to sustain the negotiability of the certificates, nor do the authorities otherwise cited by appellants recognize such negotiability. For example: In National Union Bank v. Shearer, 225 P. 470, 74 A. 351, 17 Ann. Cas. 664, the certificate there sustained acknowledged a then existing possession, referred to the goods as included in a receipt of the same date, and gave, among other things, "the marks of the goods."

[2] That negotiability of warehouse receipts, in the sense of cutting off the defenses through what is called a purchase and reliance upon the credit afforded by the face of the instrument, is determined by the law of the state is, we think, well established. Security Warehousing Co. v. Hand (C. C. A. 7) 143 F. 32, 39, 74 C. C. A. 186; Id., 206 U. S. 415, 425, 27 S. Ct. 720, 51 L. Ed. 1117,

---

[4] "Received in the Old Fort Spring Distillery Bonded Warehouse No. 63, 8th District of Kentucky, for account and subject to the order of John B. Thompson, deliverable only on return of this certificate properly indorsed, and on payment of all taxes on same and storage from the date of inspection at the rate of five cents per barrel per month. Outage guaranteed not to exceed one gallon in excess of the amount allowed by law." (Below) "5 barrels Old Jordan whisky entered into bond as follows:" Then follow details as to each separate barrel in appropriately headed columns: "Serial Nos." "Net Wine Galls." "Proof." "Proof Galls." "Number of Warehouse." "Warehouse Stamp." "When Inspected." "Old Fort Spring Distillery," under which last heading is a description of "Old Jordan handmade, sour mash, double copper whisky, Harrodsburg, Ky., trademark."

"This receipt is issued in deference to the laws of the United States and the state of Kentucky defining and regulating the duties of warehousemen."

11 Ann. Cas. 789, and cases cited at page 419; Swedish American Nat. Bank v. Bank, 89 Minn. 98, 94 N. W. 218, 99 Am. St. Rep. 549, cf. Hartford, etc., Co. v. Chicago, etc., Ry. Co., 175 U. S. 91, 100, 20 S. Ct. 33, 44 L. Ed. 84; Etheridge v. Sperry, 139 U. S. 266, 276, 277, 11 S. Ct. 565, 35 L. Ed. 171; Jordan v. Federal Trust Co. (D. C.) 296 F. 738, 741, 742. To acquire a title superior to that of the original owner the receipt must be negotiable.

Neither the "Uniform Warehouse Act" nor the "Uniform Sales Act" has been adopted in Kentucky. The cases in the Supreme Court of the United States, and elsewhere, relied upon by appellants do not, in our opinion, establish the negotiability of these certificates under common-law rules, in the sense of relief to purchaser from the effects of his vendee's fraud. The case most strongly stressed by appellants in support of the negotiability of the certificates in question is Gibson v. Stevens, 8 How. 384, 12 L. Ed. 1123. We think that decision fails to support that contention. It is based solely on the fact of an actual bill of sale for specific property, and actual purchase by the vendee of that property. The controversy was between a good-faith purchaser and an attaching creditor. The court is careful to say (page 397) that the claims of both parties "rest upon admission that the pork and flour were the property of McQueen and McCay, and had been left by them in the custody of the warehouseman as their bailees." The question "whether the owner of money fraudulently obtained from him can follow the proceeds in the hands of a bona fide purchaser without notice, and in the usual course of trade," was not involved (page 397).

[3] It follows from our conclusion that the certificates were nonnegotiable, and that, upon this record, appellants are not entitled to the whisky in question, unless as between them and appellees equity plainly requires such result. Upon this issue appellants carry the burden of proof.

[4] We cannot see that appellants have acquired any equity against appellees because of the surrender of the warehouse receipts for barreled goods, in connection with the bottling of the 12,272 cases; thus, as appellants contend, putting it in Thompson's power to issue duplicate receipts—forbidden and penalized by sections 4773 and 4775 of the Kentucky Statutes. Hinde and Rosenbloom have all along held warehouse receipts for the barreled goods. There were no outstanding receipts against cased goods. Bottling could not be done without surrender.

of warehouse receipts to that extent. The certificates in question were not statutory receipts.

We also think it plain that appellants have no equities superior to those of Hinde and Rosenbloom, who did not participate in the transaction which resulted in the fraud practiced by McAllister and his associates, and did not directly or indirectly hold out Thompson as having the right to sell the whisky, much less to issue the warehouse documents. The most which we think can be said of their knowledge of the intended sale is that Hinde, at least, is said by Thompson (denied by Hinde) to have been informed by him that he was dealing with Lee (whom Hinde had met some time before) and Lee's associates. While the price at which Thompson contracted to sell would have been satisfactory to Hinde and Rosenbloom, we understand from the record that Thompson had no authority or consent from them to sell the barreled goods, nor to sell the cased goods on credit, and certainly not to take therefor the paper of McAllister, whom neither Hinde nor Rosenbloom seem to have known or have known of. It is their insistence that no sale was to be carried out without first acquainting them with the details.

As to Thompson—not only has he done nothing which could affect the right of Hinde and Rosenbloom to have the attempted sale of the joint-venture whisky set aside; but his equities therein are plainly not inferior to those of appellants, unless they have been deceived by him into dealing with McAllister. In the issue of the warehouse certificates we find no such deceit. Nor do we see any other basis for such charge, unless—as pleaded in Murphy's amendment to intervening petition—the delivery to Murphy by McAllister of the warehouse certificates, and Murphy's payment to McAllister of the purchase price of $252,000 therefor, were made in Thompson's presence, and with his assent, acquiescence and approval; and not even then if appellants should have known that Thompson was being swindled by McAllister.

The trial judge, who saw and heard Thompson's testimony (Murphy's testimony was taken by deposition in New York), was satisfied that Thompson was not so present and did not make any such representation. In these circumstances, we think appellants have not sustained the burden of so proving.

After making due allowance for the fact that Wexler, who is said to have had supervision of the transaction as between McAllister and appellants, died without having

testified in the case, the criticism of lack of care on the part of appellants, or either of them, seems to us unsubstantial, especially when compared with what seems to us appellants' failure to exercise ordinary care or to pursue the obvious methods to ascertain the financial responsibility and standing of McAllister, Lee, the Woltenham and Hargate corporations, the legal effect of the certificates, and the good or bad faith of McAllister in his dealings with Thompson.

[5] Murphy's amended intervention petition asked that if it should be held that he did not acquire title to the certificates, or the whisky they represented, then that he recover of Thompson $252,000 with interest, with lien upon Thompson's interest in all of the whisky in the warehouse, to secure him in the payment of such sum.

The decree dismissing appellants' intervention was in terms made without prejudice to action for recovery against Thompson of personal judgment at least. While the decree, on its face, might perhaps be understood as making a broader reservation, we understand appellants' complaint in that regard to be merely that the court did not, in the intervention proceeding, give appellants a personal judgment against Thompson, and to secure payment thereof a lien on his interest in the whisky in the warehouse. We think the decree was intended to be without prejudice to further proceedings for such relief, and apparently counsel, not only for appellants, but also for Thompson, so construed it.

Assuming, for the purposes of this opinion (and without intending any intimation to that effect), that, notwithstanding the adjudication as to Thompson's freedom from deceit, as affecting the title to the whisky, there remains open any question of Thompson's personal liability, to be tried out anywhere, we see no basis for complaint of the action of the court below. Appellants had no absolute right to intervene for the trial of the issue of Thompson's personal liability. The main suit was between Hinde and Rosenbloom as plaintiffs and Thompson as sole defendant. It in no way involved the question of Thompson's personal liability to appellants; neither plaintiff was concerned with that issue. The court below had no possession of the property or funds by receivership or otherwise; appellants had no lien upon it. The only jurisdiction invoked by the main suit was by way of injunction and accounting. If appellants have still a right of action against Thompson, they have other

6 F.(2d)—33

and presumably adequate avenues of redress. We are not impressed that the marshaling of assets in the main suit is essential thereto. Permission to intervene as respects the trial of the issue of personal judgment against Thompson was thus purely discretionary with the court below. To have permitted it would have been to load the main suit with a collateral issue. Credits Co. v. United States, 177 U. S. 311, 20 S. Ct. 636, 44 L. Ed. 782; City of New York v. Gas Co., 253 U. S. 219, 40 S. Ct. 511, 64 L. Ed. 870; Glass v. Woodman (C. C. A. 8) 223 F. 621, 139 C. C. A. 167; McKee v. Brazell (C. C. A. 8) 284 F. 554.

The rule[5] that a court of equity will ordinarily retain jurisdiction to do complete justice *between the parties*, even to the extent of determining purely legal rights (but not involving intervention by third parties), are not of controlling application.

On January 3, 1923, before the intervention petition came to trial, Thompson moved to strike therefrom the allegations pertaining to "a common-law action against said defendant pleaded in the alternative," which we understand to mean the prayer for personal judgment. The motion was overruled, against Thompson's exception, without argument and without opinion. In finally disposing of the intervention proceeding the judge stated his impression that it had all along been the understanding that the question of personal judgment should be taken up and disposed of after the determination of interveners' claim to the whisky, and that, if it were held that interveners had a right to be heard herein on their claim to a personal judgment against defendant, Thompson would be given opportunity to present evidence on that matter. The existence of such an understanding the court thought accounted for "the summary manner in which I disposed of defendant's [Thompson's] motion, and for the fact that he introduced no evidence bearing thereon at the hearing in March, 1923." In that connection the opinion was expressed that interveners were not entitled to personal judgment on the grounds stated in the amended intervening petition.

The decree of the court below in the intervention proceeding is affirmed.

---

[5] Illustrated by cases such as Howard v. Leete (C. C. A. 6) 257 F. 918, 169 C. C. A. 68; Traction Co. v. American Bridge Co. (C. C. A. 6) 202 F. 184; McGowan v. Parish, 237 U. S. 285, 33 S. Ct. 521, 57 L. Ed. 849.