**In re the JULIEN COMPANY, Debtor.**

**WESTERN COTTON SERVICES CORP., Plaintiff,**

v.

**Jack F. MARLOW, Trustee of The Julien Company; Bankers Trust Company; Bank One, Texas, N.A.; Amsterdam–Rotterdam, N.V.; Bank Mees & Hope, N.V.; Federal Asset Management Company; French American Banking Corporation and Bayerische Vereinsbank AG (Union Bank of Bavaria), New York Branch, Defendants.**

**Bankruptcy No. 90–20283–B.**
**Adv. No. 90–0135.**

United States Bankruptcy Court,
W.D. Tennessee, W.D.

Nov. 15, 1991.

As Modified March 5, 1992.

See also 128 B.R. 987.

Russell J. Hensley, Bogatin, Lawson & Chiapella, Memphis, Tenn., Frederick K. Steiner, Jr., Snell & Wilmer, Phoenix, Ariz., for Western Cotton Services Corp.

John L. Ryder, Apperson, Crump, Duzane & Maxwell, Memphis, Tenn., for Amsterdam–Rotterdam, N.V.

Jack F. Marlow, Memphis, Tenn., trustee.

J. David Blaylock, Udelsohn, Blaylock & Marlow, Julie C. Chinn, Asst. U.S. Trustee, Memphis, Tenn., for the trustee.

C. Wade Cooper, Jackson & Walker, Dallas, Tex., for Bank One, Texas N.A.

Douglas W. Wilkerson, Wilkerson & Stafford, Dyersburg, Tenn., for Team Bank.

Anthony L. Paccione, James F. Gleason, Jr., Hertzog, Calamari & Gleason, New York City, for Bayerische Vereinsbank, A.G.

Barry Radick, Risa M. Rosenberg, Milbank, Tweed, Hadley & McCloy, New York City, for Bank Mees & Hope, N.V.

William J. Lowy, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for French American Banking Corp.

William J. Landers, Lee L. Piovarcy, Scott T. Beall, Martin, Tate, Morrow & Marston, P.C., Memphis, Tenn., for Bankers Trust Co.

## MEMORANDUM OPINION AND ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

WILLIAM H. BROWN, Bankruptcy Judge.

In this adversary proceeding the plaintiff, Western Cotton Services Corporation (hereinafter "Western Cotton") filed its motion for partial summary judgment on April 18, 1991, and the lender defendants (hereinafter "Lenders") responded by filing their motion for partial summary judgment on July 8, 1991. The Chapter 11 Trustee, as a defendant, objected to Western Cotton's motion and filed a Trustee's motion for partial summary judgment on July 11, 1991. The Trustee adopted the position of the Lenders' motion. The complaint, as amended, sought a determination of the validity, extent and priority of Western Cotton's asserted prepetition liens on certain bales of cotton and cotton equities. Setoff was also pled. Further, the complaint seeks allowance of certain administrative claims. The issues in the complaint are core. 28 U.S.C. § 157(b)(2)(K). This opinion contains findings of fact and conclusions of law pursuant to F.R.B.P. 7052 and 7056.

The motions were argued orally on July 18, 1991, after which the Court took the matters under advisement, and the Court has now reviewed the motions, with attachments, memoranda, and pertinent pleadings. The motions for partial summary judgment address issues of warehouseman's liens; however, the motions do not address Western Cotton's claims for administrative expenses. Also, these motions do not address any dispute which the Trustee may have with the Lenders as to the validity, extent or priority of the Lenders' secured claims.

## FINDINGS OF FACT

1. Western Cotton is a Delaware corporation licensed to do business, including warehousing, in Arizona and California.

2. The Trustee sold certain cotton owned by The Julien Company (hereinafter "debtor") but stored by Western Cotton, pursuant to this Court's order of February 15, 1990. The Trustee either holds the proceeds or has provisionally paid them to the Lenders pursuant to that order. The asserted liens and claims of Western Cotton were preserved and attached, if valid, to the sale proceeds.

3. Most of the essential facts are found in the affidavits of R.S. Pope, Vice President and Treasurer of Western Cotton, and for purposes of its motion, the Lenders (and the Trustee by adoption) assumed the facts alleged by Western Cotton to be true.

4. The cotton, to which Western Cotton asserts its liens, was stored at the time of the bankruptcy filing, on January 11, 1990, in Western Cotton's facilities in California and Arizona. As of January 11, 1990, the stored cotton had a gross value of approximately $42 million, and Commodity Credit Corporation (hereinafter "CCC".) claimed a first lien on cotton equities. Western Cotton next claims warehouseman's liens for $891,253.59 plus interest until paid. The Lenders assert a secured interest in the cotton and equities as a part of their total secured claims. Western Cotton, of course, asserts that its liens are superior to those of the Lenders.

5. The issues as to validity, extent and priority of Western Cotton's liens do not concern "bale specific" charges, which are related to warehouseman's charges for cotton stored at the time of sale and delivery. Rather, Western Cotton is asserting liens for cotton transactions unrelated to the cotton stored on January 11, 1990, but Western Cotton claims that its liens for previously stored and shipped cotton attached to the cotton still stored on January 11, 1990.

6. Upon the debtor's bankruptcy filing, Western Cotton had in storage 121,432 bales of the debtor's cotton, 95,636 being stored in California warehouses and 25,796 bales being stored in Arizona. Of the California bales, 85,048 were equity cotton, to which CCC asserted first liens for loans under the applicable federal cotton crop loan program. Of the Arizona bales, 12,566 were such equity cotton. The approximate net value of the cotton and equities, after satisfaction of CCC liens and bale specific charges, was $18.6 million. (See affidavit of R.S. Pope).

7. CCC is not a party to these motions for summary judgment and this Court had previously determined that CCC was entitled to be paid for its outstanding loans and charges. (See Adversary Proceeding No. 90–0127, *In re Julien Company,* 117 B.R. 910 (Bankr.W.D.Tenn.1990.) CCC had originally been a defendant but was dismissed on September 24, 1990, from this present adversary proceeding.

8. Western Cotton had certain bale specific charges for the stored cotton which charges were paid in accordance with the February 15, 1990, order.

9. Western Cotton also had, on January 11, 1990, non-bale specific charges outstanding for previously stored Julien Company cotton, or arising out of pre-bankruptcy contracts with the debtor, as follows:

| | |
|---|---|
| Compress compression, handling & storage charges | $208,130.93 |
| Gin compression, handling & storage charges | $ 41,361.02 |
| Shipping & invoice services | $ 89,104.40 |
| Losses on contract cancellations | $552,657.24 |
| Total (excluding interest) | $891,253.59 |

(See affidavit of R.S. Pope and its Exhibit 1).

The cancellation charges arose from pre-bankruptcy sales made by Western Cotton to The Julien Company, on which the buyer defaulted. The sales contracts were governed by the Trade Rules of the Western Cotton Shippers Association (hereinafter "Rules"). Some of these contracts had been cancelled prior to the bankruptcy filing and the Trustee rejected the balance of the contracts under 11 U.S.C. § 365, at which point damages were liquidated. Under the Rules, the damages for cancellation

were calculated under a market loss formula, which consists of the contract price minus the actual market price on the cancellation date, plus a one cent per pound penalty. (*See,* Rule 3, Clause 2, Western Cotton Shippers Trade Rules, Ex. 3 to Pope Affidavit).

10. Western Cotton asserts an actual warehouseman's lien against the cotton stored on January 11, 1990, for all charges and liabilities enumerated above and arising out of cotton transactions with The Julien Company on other, previously warehoused cotton. Its claimed lien is based upon its storage contracts, warehouse receipts, and the Uniform Commercial Code (hereinafter "UCC") as adopted in both Arizona and California.

11. In the alternative, Western Cotton asserts that it is entitled to a setoff under 11 U.S.C. § 553 and there Western Cotton relies upon a "color of lien" theory.

12. For each bale stored in Western Cotton's California warehouses on the bankruptcy filing date, Western Cotton asserts that it issued a negotiable warehouse receipt containing the following pertinent language:

> A lien is claimed in respect to all charges, liabilities and items specified in Section 7209 of the California Commercial Code, inclusive of all advances made by the undersigned for all charges and liabilities accruing from the date of delivery of said cotton to the undersigned, and specifically including, but not limited to, storage, until delivery out, including storage due to delay for which the company is not liable, compressing, banding or rebanding, insurance, interest, delivery, labor, weighing, handling, segregation, consolidation, sampling, resampling, reweighing, typing, marking, loading, unloading, reconditioning, tagging, patching, administrative and record keeping services in connection with government loans, extra services, and lien foreclosure expenses, the precise amount of which are unknown to the undersigned at the time of the issuance of this Receipt but for which it claims a lien. *A lien is also claimed for such charges and expenses incurred in relation to other goods by or on behalf of the person on whose account this cotton is held.*

(See Exs. 4 and 4A to Pope Affidavit, emphasis added).

13. For each bale stored in Western Cotton's Arizona warehouse on the bankruptcy filing date, Western Cotton asserts that it issued a negotiable warehouse receipt containing the following pertinent language:

> This cotton is described only by marks or tags; GRADE, QUALITY AND VALUE ARE UNKNOWN to the undersigned. Lien is claimed for all advances made by the undersigned and for all charges and liabilities accruing from the date of delivery of said cotton to the undersigned, including, but not limited to, storage, until delivery out, including storage due to delay for which the company is not liable, compressing, banding or rebanding, insurance, interest, delivery, labor, weighing, handling, segregation, consolidation, sampling, resampling, reweighing, typing, marking, loading, unloading, reconditioning, tagging, patching, administrative and record keeping services in connection with government loans, extra services, and lien foreclosure expenses, the precise amount of which are unknown to the undersigned at the time of the issuance of this receipt but for which it claims a lien. *A lien is also claimed for charges and expenses incurred in relation to other goods by or on behalf of the person on whose account this cotton is held.*
>
> The undersigned warehouseman is not the owner of the cotton covered by this receipt, either solely or jointly or in common with others unless otherwise stated herein. All charges for compression, handling, storage and other charges are at the current rate at time of performance as shown by tariffs published from time to time by the undersigned and available at its office (incorporated herein by reference), unless otherwise specifically agreed upon in writing.

(See Exs. 5 and 5A to Pope Affidavit, emphasis added).

14. For each bale stored in the Wenden, Arizona gin yard, Western Cotton asserts that it issued a negotiable yard receipt, which does *not* contain the broad "other goods" language emphasized above and found in the negotiable warehouse receipts referred to as Exhibits 4 and 5 to the Pope affidavit. (See Exhibits 6 and 6A to Pope affidavit) Because the amount claimed by Western Cotton is allegedly over-secured by the Arizona and California warehouse receipts, it is insignificant that the yard receipts do *not* contain the general lien language.

15. The affidavit of R.S. Pope asserts that in the cotton storage and marketing trade, it is recognized that the "other goods" language in the negotiable warehouse receipts imposes a lien "upon the cotton represented by the warehouse receipts for charges and liabilities arising out of transactions between the same parties concerning goods other than the particular cotton described in the warehouse receipts." (Pope affidavit, p. 6)

16. Had the bankruptcy not been filed, Western Cotton would have expected all of its lien claims to be paid in the ordinary course of its business with The Julien Company and in accordance with trade custom and practices. (Pope affidavit, p. 6)

17. Subsequent to this bankruptcy filing and to the transactions at issue here, Western Cotton Shippers Association has amended its rules to preclude or limit the use of "other goods" language in warehouse receipts, so as to limit the spreading of liens for previously stored cotton to presently warehoused cotton. However, the amendment is effective May 1, 1991, and does not control the outcome of this proceeding. (*See* Pope supplemental affidavit with amended Rule 4).

18. In this and similar adversary proceedings, the Court entered an order dated June 3, 1991, staying further discovery until after the disposition of the motions for partial summary judgment. That order at paragraph 2 provided:

If the opposing party to any summary judgment motion files an affidavit pursuant to Fed.R.Civ.P. 56(f) stating that, in order to present facts essential to justify such party's opposition, additional specific discovery is needed, the Court may continue summary judgment until discovery is had, deny the summary judgment, conduct a hearing to determine what discovery, if any, is needed, or make such order as is just. In the event of such a hearing, the parties shall confer, in good faith, in advance in an attempt to resolve what specific discovery is needed.

19. The Trustee objected to Western Cotton's motion for partial summary judgment and filed an affidavit stating that further discovery was needed on facts underlying Western Cotton's claims. Most of the facts asserted to be needed go to questions as to the amount of Western Cotton's claims, including the documentation utilized in calculation of the claim amounts. Also, the Trustee raises factual issues as to whether the warehouse receipts were ever issued and if so, when and in what form. Further, the affidavit raises questions about whether Western Cotton is an approved federal warehouse for storage of CCC or United States Department of Agricultural (hereinafter "USDA") cotton equities. Because of some of these factual issues raised, the Court will be unable to rule upon all of the issues raised in the motions for partial summary judgment; however, there are some undisputed facts and issues of law upon which the Court can and will rule.

20. As previously observed, and solely for the purposes of their motion for partial summary judgment, the Lenders assumed that all facts alleged by Western Cotton were true and correct, and the Lenders state that the issues presented in its present motion are "pure questions of law." (Lenders' motion at p. 4)

21. The Lenders filed an affidavit of Scott T. Beall, an attorney, which in large part contains hearsay rather than personal knowledge, and it is not admissible as evidence as to actions of the USDA. F.R.C.P. 56(e).

22. Mr. Beall executed a supplemental affidavit which also contains hearsay, and

it is not admissible as evidence as to actions of the CCC or USDA. F.R.C.P. 56(e).

23. Bankers Trust Company (hereinafter "BTCo") filed declarations under penalty of perjury executed by Joseph E. Broxson and H.E. Maynard, both employees of USDA and both familiar with CCC loan programs. The declarations, dated July 9, 1991, state that CCC will approve warehouse receipts containing general lien language if such language is authorized by the licensing authority. However, as of the 1990 crop year, CCC would not loan money against such a warehouse receipt in the absence of a waiver. Western Cotton was not a producer (grower) of cotton but did contract with CCC to store certain cotton. CCC discovered prior to October, 1990, that Western Cotton was utilizing warehouse receipts containing general lien language and thereafter attempted to require Western Cotton to execute a waiver. However, Western Cotton did not sign a CCC waiver for 1990 or 1991 cotton, and an unexecuted lien waiver form is attached to the declarations which waiver only generally applies to CCC. CCC has discovered that some warehouses, other than Western Cotton, also utilized general lien language in their warehouse receipts. Each of these facts as to CCC are moot in view of CCC's first priority liens having been satisfied.

### APPLICABLE STATE LAW

The UCC, as adopted in Arizona at the time of these transactions, provides as follows:

#### ARIZONA UCC SECTION 7–209

(Ariz.Rev.Stat.Ann. § 47–7209)

§ 47–7209. Lien of Warehouseman.

A. A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law. *If the person on whose account the goods are held is liable for like charges or expenses in relation to other goods whenever deposited and it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods, the warehouseman also has a lien against him for such charges and expenses whether or not the other goods have been delivered by the warehouseman.* But against a person to whom a negotiable warehouse receipt is duly negotiated a warehouseman's lien is limited to charges in an amount or at a rate specified on the receipt or if no charges are so specified then to a reasonable charge for storage of the goods covered by the receipt subsequent to the date of the receipt.

B. The warehouseman may also reserve a security interest against the bailor for a maximum amount specified on the receipt for charges other than those specified in subsection A of this section, such as for money advanced and interest. Such a security interest is governed by the chapter on secured transactions. (chapter 9 of this title).

(Emphasis added)

The UCC as adopted in California provides as follows:

§ 7209. Lien of warehouseman.

(1) A warehouseman has a lien against the bailor on the goods deposited or on the proceeds thereof in his possession for charges for storage, processing incidental to storage, or transportation, including demurrage and terminal charges, insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law. *If the person on whose account the goods are held is liable for like charges or expenses in relation to other goods whenever deposited [and it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods], the warehouseman also has a lien against him for such charges and expenses whether or not the other goods have been delivered by the warehouseman.*

But against a person to whom a negotiable warehouse receipt is duly negotiated a warehouseman's lien is limited to charges specified on the receipt or if no charges are so specified then to a reasonable charge for storage of the goods covered by the receipt subsequent to the date of the receipt.

(2) The warehouseman may also reserve a security interest against the bailor for charges other than those specified in subdivision (1), such as for money advanced and interest, but if a receipt is issued for the goods such a security interest is not valid as against third persons without notice unless the maximum amount thereof is conspicuously specified (Section 1201) on the receipt. Such a security interest is governed by the division on secured transactions (Division 9).

(3)(a) A warehouseman's lien for charges and expenses under subdivision (1) or a security interest under subdivision (2) is also effective against any person who so entrusted the bailor with possession of the goods that a pledge of them by him to a good faith purchaser for value would have been valid but is not effective against a person as to whom the document confers no right in the goods covered by it under Section 7503.

.     .     .     .     .

(4) A warehouseman loses his lien on any goods which he voluntarily delivers or which he unjustifiably refuses to deliver.

(Emphasis added. Apparently, the words in parentheses were not included in the California statute at the time of the subject transactions.)

### CONCLUSIONS OF LAW

#### § 545(2)

▌ The Lenders, rather than the Trustee, argue that the real dispute should be between the Trustee and Western Cotton because the validity, extent and priority of the Lenders' security interests are not presently at issue. That is partially cor-rect; however, if Western Cotton prevails it places the Lenders in a secondary position to Western Cotton and since the Lenders may have been paid the sale proceeds provisionally, the Lenders would have to disgorge some of the proceeds. Clearly, under 11 U.S.C. § 101(53) the UCC based liens are statutory liens. The Lenders also argue that the Trustee could avoid the statutory liens of Western Cotton under 11 U.S.C. § 545(2);[1] however, this is a hollow and "shoot yourself in the foot" argument. First, the Lenders lack standing to do what only the Trustee may do, and the Trustee has not sought avoidance under § 545(2). *See, e.g., Matter of Feldhahn*, 92 B.R. 834, 836 (Bankr.S.D.Iowa 1988). Should the Trustee have pursued and succeeded in an avoidance, this would be the equivalent to a disallowance and voiding of Western Cotton's secured claim under 11 U.S.C. § 506(d), and under 11 U.S.C. § 551 a lien which is void under § 506(d) or avoided under § 545 is preserved for the benefit of the estate. Thus, the result of the Lenders' argument, if adopted at this point, would be to disallow the secured claim of Western Cotton, to place the Trustee in the secured position of Western Cotton, and to require the Lenders to disgorge some of the net sales proceeds to the Trustee. Surely, the Lenders are not serious in this argument.

▌ Moreover, the primary issue before the Court is whether the negotiable warehouse receipts on their face sufficiently note a general lien for previously stored cotton. If so, the Trustee can not in reality or hypothetically be a bona fide purchaser of the warehouse receipts under § 545(2) since such a purchaser would take the warehouse receipts with notice of what appears on the face of the receipts. *See* UCC § 7–501(4). The Court views the Lenders' arguments as to § 545(2) as being merely circular and of no substance or merit in the context of the present motions for partial summary judgment.

---

1. **§ 545. Statutory liens.** The Trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien—(2) is not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser that purchases such property at the time of the commencement of the case, whether or not such a purchaser exits ...

## FACTUAL ISSUES

Western Cotton asserts certain facts supported by affidavits. The Trustee filed an affidavit in compliance with this Court's order of June 3, 1991, stating that additional discovery was necessary to fully develop essential facts. And, in a confusing posture, BTCo first admits for purposes of its motion that Western Cotton's facts are true and then adopts the Trustee's affidavit that other facts are unknown or unverified. The Court may of course only issue summary judgment when "there is no *genuine* issue as to any *material* fact and ... the moving party is entitled to a summary judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." F.R.C.P. 56(c), *emphasis* added; *see also, e.g., In re Suburban Motor Freight, Inc.,* 124 B.R. 984 (Bankr.S.D.Ohio 1990).

■ The Court is puzzled as to why the Trustee and Lenders would contend that there is a factual issue as to whether Western Cotton issued and delivered warehouse receipts for each bale of cotton in storage at the time of the bankruptcy filing. The position of the Lenders throughout this bankruptcy case has been that they held all warehouse receipts or an interest in them as partial security for their debt. Further, there has been proof in other proceedings that BTCo acted as the custodian of the collateral, including warehouse receipts. (*See, e.g.,* Adversary Proceeding No. 90–0104, *In re Julien Company,* 127 B.R. 604 (Bankr.W.D.Tenn.1991). Moreover and of more importance, the Trustee has sold most, if not all, of the cotton and equities which were in storage as of the bankruptcy filing and which are relevant to this adversary proceeding. How could the Trustee have sold the cotton without first having and then relinquishing the warehouse receipts to the buyers? Assuming that the Trustee or his agents had the warehouse receipts in his possession at some point in time, did he not examine them or copy them, knowing that the very issues raised in the pending motions were on the hori-

zon? The Court finds the Trustee's and Lenders' assertions that they have no knowledge of the warehouse receipts, in existence as of the bankruptcy filing, to be implausible. Nevertheless, because the Trustee's affidavit raises material issues of fact, at least some of which *may* be genuine, the Court will be unable to determine in these motions the amount of Western Cotton's secured claims. The Court will, however, rule on some issues which are legal in nature. Furthermore, under the Court's June 3, 1991, order, the Court will strictly limit further factual discovery to sixty (60) days from the entry of this order and will reserve the question of whether the estate and/or the Lenders should bear some or all of the costs of all further discovery. The Court is perplexed in this case as to why so much factual discovery is being taken in those instances where the Trustee should have records of assets he received and sold and where BTCo, as a custodian of the debtor's collateral documents, should have records of the collateral. An impression could be given that some parties are being dilatory and are engaging in needless discovery, and the Court does not wish to be given that impression. The Court recognizes that some legitimate areas of discovery, such as the documentation supporting the compress, ginning, shipping, and contract breach charges, may exist.

## SPREADING LIEN

### UCC § 7–209(1)

The primary legal issue, as conceded by all parties, is whether the general lien claimed by Western Cotton spreads to any or all of the types of charges asserted in finding of fact number 9. For purposes of this issue the Court must assume that Western Cotton did issue warehouse receipts identical to those attached as Exhibits 4 and 5 of the Pope affidavit. If in fact further discovery reveals that some warehouse receipts were not issued or were issued in a different form, that may merely affect the amount of Western Cotton's claim.

■ The Lenders raise a red herring argument when they state that some of Western Cotton's warehouse receipts may not comport to USDA requirements. The declarations from the two USDA representatives do not support that Western Cotton was violating USDA regulations or industry standards. Assuming *arguendo* a violation of USDA regulations, that would not determine the present motions which legally rely solely upon the basis of UCC § 7–209 as adopted in Arizona and California. The Lenders and the Trustee lack standing to assert a defense which *may* have been available *only* to USDA or CCC, which has been paid and dismissed as a party to this proceeding. The Lenders' and the Trustee's arguments here have come across as a weak effort to shotgun a defense and say if we can't win on the basis of UCC § 7–209, please let us win on some basis.

■ As a matter of fact, based upon the affidavits and declarations, Western Cotton has not waived its right to assert a general lien as to any present party. Therefore, the issue for decision concerns the breadth and meaning of the general liens under applicable California and Arizona UCC law. The Lenders concede in their memorandum that the Arizona and California sample warehouse receipts attached to Western Cotton's motion meet "the statutory requirements in the second sentence of UCC § 7–209(1) and reserves a general lien against the Possessory Cotton [as of the bankruptcy filing date] for charges and expenses *in relation to other goods*." (Lenders' Memorandum, p. 19, emphasis in Memorandum) The laws of Arizona and California control since the goods were stored in those states. *See Bache v. Hinde*, 6 F.2d 508, 511 (6th Cir.1925), *cert. denied*, 269 U.S. 581, 46 S.Ct. 106, 70 L.Ed. 423 (1925). Breaking down the applicable UCC § 7–209(1) reveals three sentences: "The first describes the specific, possessory lien which a warehouseman may claim for enumerated charges and expenses. The second sentence describes the general lien which *may* be asserted by a warehouseman "for like charges or expenses in relation to other goods whenever deposited ..." The third sentence applies a limitation on the general lien as against a person to whom a negotiable warehouse receipt is duly negotiated ..."

■ The Court has previously noted that the Trustee could not take the warehouse receipts free of the liens noted on the face thereof. Therefore, the key question is whether the general, non-possessory lien retained by Western Cotton is overly broad or whether it fits within the statutory limitations described in the first sentence of UCC § 7–209(1). The Court concludes that the primary legal issue is one of statutory construction and the Court finds the language of the applicable UCC § 7–209(1) to be clear and unambiguous. The statute first allows a lien for "charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law." The general lien on "other goods whenever deposited" obviously requires that at some point in time the other goods to which a general lien is sought to be spread have actually been deposited with the warehouseman. Western Cotton must therefore demonstrate that it previously had in its possession the other cotton to which it claims a general spreading lien.

## BREACH OF CONTRACT CLAIM

■ Therein lies one of the difficulties with the contractual breach claim which, according to the Pope affidavit, arose from the debtor's failure to consummate the purchase of certain cotton from Western Cotton. A large part (62%) of Western Cotton's claim ($552,657.24) is for damages from the debtor's breach of contract. Such damage claims do not seem to fit within the usual warehouse charges listed in the first sentence of UCC § 7–209(1). However, a factual question exists as to whether the contract damage claims arise from goods which were at some point deposited with Western Cotton and as to whether the damages were "reasonably incurred in" the sale of deposited goods. It is by no means

clear that Western Cotton ever had possession on deposit of the cotton subject of the alleged contractual breaches; therefore, the Court may not grant summary judgment in favor of Western Cotton on its claim for contractual damages, but will order that all further discovery be completed within sixty (60) days from entry of this Order.

Furthermore, the language of the second sentence of UCC § 7–209(1) limits the general lien to "like charges or expenses" which obviously refers to the specific charges described in the first sentence. The Official Comments to UCC § 7–209 state that the specific possessory lien applies to the "usual charges arising out of a storage transaction; by notation on the receipt it can be made a general lien extending to like charges in relation to other goods." UCC § 7–209, Official Comment 1. UCC § 7–209 speaks in terms of charges and expenses rather than in terms of a broader bankruptcy concept of debt or liability. *Compare, Import Systems International, Inc. v. Houston Central Industries*, 13 UCC Rep.Serv.2d 1239, 752 F.Supp. 745 (D.S.D.Tex.1990) (discussing UCC § 7–209(a) and concluding that attorney's fees were not recoverable by the warehouseman). The Court should not construe the statute in a broader sense than its natural language dictates. This is "consistent with the strict construction applied to statutory liens." *Jefferson County Cooperative Association v. Northeast Kansas Production Credit Association*, 73 B.R. 3, 5 (D.Kan.1982).

## COMPRESS, GIN AND SERVICE CHARGES

For those warehouse receipts actually issued as to the cotton in the possession of Western Cotton on the date of the bankruptcy filing, and if those receipts are in the form attached as Exhibits 4 and 5 to the R.S. Pope affidavit, then to the extent that Western Cotton's compress compression, handling and storage charges are charges related to the debtor's other goods which at some point were deposited with Western Cotton, it would appear that to the extent that those charges are for "stor-

age," "labor," "charges ... in relation to the goods," or "for expenses necessary for preservation of the goods or reasonably incurred in their sale," Western Cotton is entitled as a matter of law to spread its possessory lien to a general lien for those charges. The same conclusion is reached as to Western Cotton's claim for gin compression, handling, and storage charges. However, the Lenders and the Trustee state that they have not seen all of the underlying documentation supporting these two classes of claims; therefore, a factual issue remains as to whether the compress and gin charges relate to goods which were at some point deposited with Western Cotton and perhaps whether the expenses were "necessary for preservation of the goods or reasonably incurred in their sale ..." As to the service charges arising from shipping and invoicing the same factual questions exist.

Therefore, the Court concludes that further discovery is necessary but it is to be completed within sixty (60) days from entry of this Order. However, to the extent that Western Cotton can demonstrate by proof that it actually issued warehouse receipts in the form of the examples attached to its motion and thus had a possessory lien on cotton as of the date of bankruptcy and if the proof shows that its general lien charges are "like charges or expenses" as described in the first sentence of UCC § 7–209(1), and to the extent that those like charges or expenses relate to goods at some point deposited with Western Cotton, then Western Cotton, as a matter of law, will be entitled to spread its lien to cover those like charges and expenses.

## SETOFF AND COLOR OF LIEN

As an alternative argument, Western Cotton contends that under 11 U.S.C. § 553(a) it enjoys a right of setoff against the net proceeds received by the Trustee. The argument proceeds along these lines: (1) The debtor owed Western Cotton for $891,253.59 in prebankruptcy charges. (2) Western Cotton held cotton, as of the date of the bankruptcy filing, with a net value of approximately $18 million, which value

constituted a debt owing by Western Cotton to the debtor. (3) The breach of contract claim may be used as a part of the setoff. (4) Notwithstanding that Western Cotton was a bailee of the debtor's property and thus would not normally enjoy a setoff right, Western Cotton enjoys an exception to the general bailee rule because of Western Cotton's "color of lien."

The setoff argument therefore depends upon Western Cotton having a color of lien, which has been argued to include an expectation between the parties of a right to payment from the warehoused cotton. *See, e.g., Half Moon Fruit & Produce Co. v. Floyd*, 60 F.2d 799 (9th Cir.1932). In other words, Western Cotton contends that in the ordinary course of business it expected to have a color of lien, which of course is less than an actual lien but more than a mere and absolutely unsecured claim.

The Lenders argue that no mutual debt existed and that the color of lien concept does not apply to bailor/bailee relationships.

It is unnecessary for the Court to rule at this time in this proceeding on the color of lien theory. The Court has concluded that Western Cotton will be entitled to a statutory general lien, at least as to some charges and expenses, if further discovery shows that the statutory requirements are met. The contractual breach damage claims are the most questionable statutory lien claims. Nevertheless, it is unnecessary for the Court to prospectively rule in an advisory nature on Western Cotton's alternative color of lien theory until the Court determines the extent to which the statutory lien encompasses Western Cotton's claims. That decision will be ripe after the conclusion of the additional sixty (60) day discovery time.

IT IS THEREFORE ORDERED:

1. The Lenders lack standing to assert a § 545(2) avoidance action and no such action is pending before the Court as to Western Cotton.

2. The Court will allow further factual discovery to all parties but strictly limits that discovery to sixty (60) days from the entry of this Order, and the Court reserves whether the estate and/or Lenders will be required to pay for some or all of this additional discovery. The Court directs the parties to promptly mutually produce and exchange all relevant documents.

3. Western Cotton is entitled to a spreading or general lien under UCC § 7-209(1), as adopted in Arizona and California at the pertinent times, which lien depends upon: (1) The issuance of warehouse receipts, in the form of the examples attached to the R.S. Pope affidavit, which receipts cover goods in the possession of Western Cotton as of the bankruptcy filing date; (2) Proof that Western Cotton previously had on deposit other goods to which its lien is sought to be spread; and (3) Proof that its charges, as to the other non-possessory goods, are "like charges and expenses" as described in the first sentence of UCC § 7-209(1).

4. Western Cotton's example warehouse receipts, attached to the Pope affidavit, meet the statutory requirements of UCC § 7-209(1) and reserve a general lien. The factual and legal issues remaining address the extent of that general lien.

5. The issue of whether Western Cotton complied with USDA or CCC regulations is not material to this proceeding. Western Cotton has not waived its right to assert a general lien as to the Trustee or the Lenders.

6. The Court reserves ruling on the accruing interest, set-off and color of lien issues until after discovery and ruling on all statutory lien issues.

7. A status conference is set for February 27, 1991, at 9:30 a.m..

SO ORDERED.